2005 ND 214

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Luis Ignacio HERNANDEZ, Sr., Defendant and Appellant.**

No. 20050047.

Supreme Court of North Dakota.

Dec. 20, 2005.

Birch P. Burdick (argued), State's Attorney, and Charles B. Neff, Jr. (appeared), third-year law student, under the Rule on Limited Practice of Law by Law Students, Fargo, N.D., for plaintiff and appellee.

Dennis D. Fisher, Stefanson, Plambeck, Foss & Fisher, Moorhead, MN, for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Luis I. Hernandez, Sr., appeals from a judgment entered after a jury found him guilty of gross sexual imposition, and from an order denying his motions for a new trial. We hold the trial court did not abuse its discretion in allowing the State's handwriting expert to identify Hernandez as the author of a letter handwritten in Spanish, the court did not obviously err in permitting the jury to see an unredacted copy of an English translation of the letter, the court did not abuse its discretion in admitting testimony about Hernandez's prior sexual abuse of the complainant, and the court did not err in admitting testimony and a report that nonmotile sperm was found in a swab taken from the complainant during an examination by an emergency room pediatrician. We affirm.

I

[¶ 2] The State charged Hernandez with gross sexual imposition under N.D.C.C. § 12.1–20–03 for allegedly engaging in a sexual act with the complainant, the twelve-year-old daughter of his former girlfriend. At trial, the State presented evidence that Hernandez picked up the complainant after school on May 22, 2003, and took her to a Fargo motel, where he engaged in sexual acts with her. The complainant testified Hernandez ultimately drove her to her mother's home, where the complainant told her mother that Hernandez had raped her. The complainant's mother testified she found a letter handwritten in Spanish in the screen door of her house about a day or two after Hernandez was arrested. The letter was not addressed to a recipient and was not signed by its author. The State introduced an English translation of the letter, which stated "she went to the hotel with me and we had sex and that I didn't rape her" and "I don't deny that I got involved with her but she gave it to me voluntarily." The State also introduced expert testimony that identified Hernandez as the author of the handwritten letter.

[¶ 3] Hernandez claimed the complainant's mother manipulated her daughter to fabricate the prosecution against him. There was evidence that Hernandez and the complainant's mother had a stormy relationship over the previous ten years.

They were never married, but they had a son together in 1994. According to Hernandez, the complainant's mother did not approve of his relationship with his current girlfriend, and in May 2003, his physical mobility was severely limited by a February 2003 automobile accident and a "halo" device he wore as part of his rehabilitation for a spinal cord injury. Hernandez testified he met his son, the complainant's mother, and the complainant at a Fargo motel on May 22, 2003. According to Hernandez, his son and the complainant went swimming in the motel pool, and the complainant's mother then tried to engage in sexual activity with him in the motel room. Hernandez testified the two children subsequently returned from swimming and then showered, and everyone left the motel together. He claimed he did not engage in any sexual activity with the complainant on May 22, 2003. A jury found Hernandez guilty of gross sexual imposition. The trial court denied Hernandez's motion and amended motion for a new trial.

[¶ 4] The trial court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. Hernandez's appeal is timely under N.D.R.App.P. 4(b). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 29–28–06.

## II

[¶ 5] Hernandez argues the trial court erred in permitting a licensed private investigator to testify as a handwriting expert without properly exercising the gatekeeping functions required by *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Hernandez claims this Court must follow the *Daubert* and *Kumho Tire* decisions. Hernandez also argues the private investigator lacked the qualifications, proficiency, and scientific methodology to analyze the writing in the Spanish letter, and the court erred in allowing him to testify that Hernandez wrote the letter.

[¶ 6] This Court has never explicitly adopted *Daubert* and *Kumho Tire*. *See Howe v. Microsoft Corp.*, 2003 ND 12, ¶ 27 n. 1, 656 N.W.2d 285. Contrary to Hernandez's assertion, this Court is not required to follow *Daubert* and *Kumho Tire*, which involved admissibility of expert testimony in federal courts under the federal rules of evidence. This Court has a formal process for adopting procedural rules after appropriate study and recommendation by the Joint Procedure Committee, and we decline Hernandez's invitation to adopt *Daubert* by judicial decision. *See State v. Osier*, 1997 ND 170, ¶ 5 n. 1, 569 N.W.2d 441 (refusing to adopt procedural rule by opinion in litigated appeal).

[¶ 7] Under North Dakota law, the admission of expert testimony is governed by N.D.R.Ev. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[¶ 8] Rule 702, N.D.R.Ev., envisions generous allowance of the use of expert testimony if the witness is shown to have some degree of expertise in the field in which the witness is to testify. *Gonzalez v. Tounjian*, 2003 ND 121, ¶ 24, 665 N.W.2d 705. An expert need not be a specialist in a highly particularized field if the expert's knowledge, training, education, and experience will assist the trier of fact. *Myer v. Rygg*, 2001 ND 123, ¶ 14, 630 N.W.2d 62. A trial court has broad

discretion to determine whether a witness is qualified as an expert and whether the witness's testimony will assist the trier of fact. *Harfield v. Tate*, 2004 ND 45, ¶ 21, 675 N.W.2d 155. A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, its decision is not the product of a rational mental process leading to a reasoned decision, or it misinterprets or misapplies the law. *Rygg*, at ¶ 8. We have said we are reluctant to interfere with the broad discretion given to a trial court to decide the qualifications and usefulness of expert witnesses. *Id.* A trial court does not abuse its discretion in admitting expert testimony whenever the expert's specialized knowledge will assist the trier of fact, even if the expert does not possess a particular expertise or special certification. *Id.* at ¶ 15.

[¶ 9] This Court has implicitly recognized the admissibility of expert opinions about handwriting. *See State v. Noorlun*, 2005 ND 189, ¶¶ 15–19, 705 N.W.2d 819; *Timmerman Leasing, Inc. v. Christianson*, 525 N.W.2d 659, 663 (N.D.1994); *In re Peterson*, 178 N.W.2d 738, 740–41 (N.D. 1970); *Klundt v. Pfeifle*, 77 N.D. 132, 139–41, 41 N.W.2d 416, 420–21 (1950). Here, the private investigator testified he had worked as an agent for the North Dakota Bureau of Criminal Investigation for almost 30 years, and in 1981 he received training for comparing questioned writing with known writing. He testified he had assisted in analyzing handwriting in 100 to 200 cases. Under our standard for the allowance of expert testimony, we conclude the trial court did not act arbitrarily, unreasonably, or unconscionably, or misinterpret or misapply the law in determining the private investigator was qualified as an expert in handwriting analysis and deciding his testimony would assist the jury. We therefore hold the court did not abuse its discretion in determining the private investigator was qualified to testify as an expert and his testimony would assist the jury.

## III

[¶ 10] Hernandez argues the trial court erred in admitting into evidence an unredacted English translation of the Spanish letter. He argues the unredacted English translation of the letter included statements about prior uncharged sexual misconduct by him and violated the parties' agreement to redact references to prior sexual contact between him and the complainant in all documents submitted to the jury. Hernandez specifically cites and emphasizes the following passage from the English translation of the letter:

> *Do you remember when she went with me before that in the red truck and she came back with a smile from ear to ear because that day she was able to get it off twice and she was really happy. If I had raped her she wouldn't have been happy when I left her at the house. She would have been mad and she would have told you that I raped her but I didn't rape her she just put out willingly. She should say that we had sex not that I raped her.* And if they ask you if you want to press charges say no. My lawyer wants me to tell the court that you were seeing me after the charges. And already checked the hotels where we were seeing each other and that you had the yellow car then I gave you the truck because a lot of people saw me in the truck but if I tell them that ·Child Protection will take the children away from you I don't want that. *You better tell her that it was really voluntary sex not rape and you shouldn't press charges because if you don't do it they want to give me 20 years 15 at least.* And if I say that you were seeing me I could do less and that you were my

accomplice they can lock you up too because you didn't call the police on me. I don't want that to happen. Take care of it between you and her.

[¶ 11] The English translation of the Spanish letter was not specifically identified as a document subject to the State's proposed redaction agreement, and it was admitted into evidence without an objection by Hernandez. Moreover, before the exhibits were submitted to the jury, the court noted the State had redacted parts of some exhibits. The court then asked defense counsel whether there were any objections to the exhibits, and counsel responded that he did not have any objections.

[¶ 12] A party may not assert alleged irregularities during a trial unless the party objects when they occur and allows the trial court an opportunity to take appropriate action to remedy any prejudice that may result from the alleged irregularities. *State v. Lee*, 2004 ND 176, ¶ 10, 687 N.W.2d 237. A party, not the trial judge, must take the initiative to object to offered evidence. *Id.* A party's failure to object to evidence admitted at trial generally waives the party's right to complain on appeal about the admission of the evidence. *Id.* The rationale for that rule precludes a defendant from inviting error in the hope that if the defendant does not prevail in the trial court, he will prevail upon appellate review of the invited error. *Id.* at ¶ 11.

[¶ 13] Here, Hernandez did more than not object to the admission of the unredacted portion of the letter cited by him; his counsel specifically indicated he did not object to the letter. Because Hernandez did not object to the admission of the unredacted letter at trial, our standard of review requires a showing of obvious error under N.D.R.Crim.P. 52(b). *See State v. Olander*, 1998 ND 50, ¶ 11, 575

N.W.2d 658. We exercise our power to consider obvious error cautiously and only in exceptional situations in which the defendant has suffered a serious injustice. *Id.* at ¶ 12. A defendant has the burden of establishing obvious error by showing error that is plain and affects substantial rights. *Id.* at ¶ 15. An error is not obvious unless there is a "clear deviation from an applicable legal rule under current law." *Id.* at ¶ 14. A clear deviation from an applicable rule also must affect substantial rights, which requires the defendant to show the error was prejudicial, or affected the outcome of the proceeding. *Id.* at ¶ 15. In *Olander*, at ¶ 16 (quoting *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)), this Court explained that once an accused establishes an obvious error affects substantial rights, an appellate court has discretion to correct the error and should correct it if it " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' "

[¶ 14] The context of the English translation of the Spanish letter indicates the letter was intended for the complainant's mother and referred to the immediate circumstances culminating in this criminal charge against Hernandez. The interpreter's note for the English translation of the letter indicates the Spanish version of the letter was notable for its lack of punctuation, incorrect spelling, and illegible handwriting. Immediately before the part of the letter cited by Hernandez, the letter provides:

The day of Court I got a letter making fun of me like always that I am here because of you and that I am here for this and for that, If all of you give me the opportunity I want to do things right where I did things wrong I don't want to live the way I am living I want things to be like they were when I got out of jail the last time. And for the two of us to

get ahead. But for that to happen she has to tell the truth, that she went to the hotel with me and we had sex and that I didn't rape her. She told me to come up I told her that I couldn't she went up but she couldn't get it off by herself and that I should come up but when I went up my right hand was hurting and it went to sleep on me She got mad and tried to throw me to one side and I fell on top of her and I hit her in the face with the (illegible) She got mad, I told her that we couldn't do it anymore She even told me that she wanted (illegible) we were going to stop. She made fun of me and told me that after the accident I was not good for sex anymore. I told her that I wanted to tell you and she told me that I had better not ever tell you because you were not going to believe me I told her that even so I was going to tell you when we got to the house She was mad and scared that I was going to tell you about the sex. She went and told you and the police She told me on the way that if I told you she was going to kill herself. That you were going to believe me but (illegible) her instead because blood is thicker than water and that is what happened. You caught her talking on the telephone and you heard her telling me that blood is thicker than water that you were not going to believe me just her But what were you going to believe if I didn't tell you any thing. That is why I think she was mad about what happened in the room and what I told her that I was going to tell you She got scared of what you were going to say that is why she said what she said. I don't deny that I got involved with her but she gave it to me voluntarily.

[¶ 15] Although the language about "remember[ing] when she went with me before that in the red truck" suggests prior acts, the context of the entire letter indicates Hernandez was discussing the circumstances of the conduct charged in this action. The letter states Hernandez's belief that the twelve-year-old complainant voluntarily engaged in sexual relations with him. Section 12.1–20–03, N.D.C.C., makes it a crime to have sexual contact with a person who is less than 15 years old regardless of consent. *See State v. Schill*, 406 N.W.2d 660 (N.D.1987). In the context of the English translation of the entire letter, we conclude Hernandez has not demonstrated that any error in failing to ensure redaction of the language cited by him affected his substantial rights, or that correcting any such error would preserve the fairness, integrity, or public reputation of judicial proceedings. We therefore conclude Hernandez has failed to show obvious error under N.D.R.Crim.P. 52(b).

## IV

[¶ 16] Hernandez argues the trial court erred in allowing two pediatricians to testify that the complainant reported she had been sexually abused by Hernandez on numerous occasions over the previous seven years. The trial court initially granted Hernandez's motion in limine to suppress testimony about specific incidences of prior sexual misconduct by him against the complainant. At trial, an emergency room pediatrician, Dr. Anila Jacob, testified on direct examination by the State that she tested the complainant for sexually transmitted diseases on May 22, 2003, and the complainant tested positive for gonorrhea. On cross-examination by Hernandez, Dr. Jacob testified it takes about five days after a person has been exposed to gonorrhea to become infected. On re-examination by the State, Dr. Jacob testified the complainant reported she had been sexually abused by Hernandez on numerous occasions over the past seven years and had been sexually abused by Hernandez about

a week before May 22. The State also elicited testimony from Dr. Alonna Norberg, a pediatrician who examined the complainant about six days after the May 22 examination. Dr. Norberg testified the complainant reported she had been sexually assaulted by Hernandez one week before May 22 and there had been other prior assaults by him.

[¶ 17] Hernandez argues the trial court erred in admitting the pediatricians' testimony that the complainant reported there had been prior sexual abuse of the complainant by him. The State argues Hernandez failed to preserve this issue at trial because he did not object to the State's initial question about tests for sexually transmitted diseases and gonorrhea. The State also argues the trial court properly exercised its discretion in allowing the pediatricians' testimony, because Hernandez opened the door for limited testimony about his prior misconduct against the complainant when he asked Dr. Jacob how long it took for gonorrhea to incubate and she responded it took five days.

[¶ 18] We conclude Hernandez's failure to object to the State's questions about tests for sexually transmitted diseases and gonorrhea did not waive his right to raise the issue about the pediatricians' subsequent testimony regarding prior sexual misconduct by him against the complainant. Hernandez objected to the pediatricians' testimony when it was elicited during trial, and the issue is whether Hernandez opened the door for the pediatricians' testimony about his prior sexual acts with the complainant.

[¶ 19] Evidence of prior bad acts or crimes is generally not admissible under N.D.R.Ev. 404(b) to show the defendant acted in conformity therewith, but may be admissible for some other purpose. *See State v. Anderson*, 2003 ND 30, ¶¶ 13–

14, 657 N.W.2d 245. Rule 404(b), N.D.R.Ev., acknowledges the inherent prejudicial effect that prior bad act evidence may have on the trier of fact. *State v. Micko*, 393 N.W.2d 741, 744 (N.D.1986). Rule 404(b), N.D.R.Ev., excludes evidence of other acts and crimes committed by a defendant when they are independent of the charged crime and do not fit into one of the rule's exceptions. *Anderson*, at ¶ 14.

[¶ 20] This Court also has considered the admissibility of otherwise inadmissible evidence after the opposing party opened the door for the admission of that evidence. *State v. Jensen*, 2000 ND 28, ¶¶ 5–14, 606 N.W.2d 507 (concluding trial court did not abuse discretion in refusing to allow defendant to introduce evidence of prior anal intercourse and rough sex between defendant and victim because limited introduction of evidence regarding prior sex between defendant and victim did not open door for evidence offered by defendant); *State v. Purdy*, 491 N.W.2d 402, 409–10 (N.D.1992) (holding no obvious error to allow questioning of defendant about arrest at clinic because defendant opened door for that evidence during testimony on direct examination); *State v. Flynn*, 479 N.W.2d 477, 479–80 (N.D.1992) (holding no error in allowing police officer's rebuttal testimony regarding use of multiple social security numbers because defendant opened door for officer's testimony by attempting to show person writing check had used different social security number); *State v. Jensen*, 282 N.W.2d 55, 64–69 (N.D.1979) (allowing admission of otherwise inadmissible evidence about prior altercation between defendant and another because defendant opened door for evidence during examination of witnesses).

[¶ 21] The common thread in those decisions is that a trial court is vest-

ed with discretion to decide whether a party has opened the door for the admission of otherwise inadmissible evidence. *See* 2 Clifford S. Fishman, *Jones on Evidence, Civil and Criminal* § 11:34 (7th ed.1994); 1 John Henry Wigmore, *Evidence in Trials at Common Law* § 15, at 746–47 (Tillers rev. 1983); 1 John W. Strong, *McCormick on Evidence* § 57 (5th ed.1999). In *Jensen,* 2000 ND 28, ¶¶ 11–14, 606 N.W.2d 507, this Court specifically recognized the concept of opening the door for the admission of otherwise inadmissible evidence was not unlimited, and a trial court's decision about the extent of an opened door was reviewed under the abuse-of-discretion standard. That abuse-of-discretion standard comports with this Court's standard of review of evidentiary rulings. *State v. Christensen,* 1997 ND 57, ¶ 5, 561 N.W.2d 631.

▆ [¶ 22] Here, issues about opening the door for evidence about Hernandez's prior sexual misconduct against the complainant initially arose during the testimony of both the complainant and the complainant's mother. During cross-examination of the complainant, defense counsel indicated the complainant had not called her mother after the May 22, 2003, incident. Outside the presence of the jury, the trial court indicated defense counsel had opened the door for the State to ask why the complainant had not called her mother and for the complainant to respond that she had not planned on telling her mother this had been going on for several years. The complainant subsequently testified she did not call her mother after the May 22, 2003, incident, because she did not plan on telling her mother she had been raped. During cross-examination of the complainant's mother, defense counsel asked her if Hernandez had always treated the complainant with respect before May 22, 2003, and the complainant's mother

responded "not exactly." After a discussion outside the presence of the jury, the court allowed defense counsel to withdraw that question and response, but the court admonished counsel "one more time, if there's anything that gets remotely close to opening this door that is partway open now, I'm going to take the prosecutor's position on this." Thereafter, the jury heard testimony that the complainant tested positive for gonorrhea and the incubation period for gonorrhea was five days. When the State asked the emergency room pediatrician, Dr. Jacob, about the complainant's history, the court said it would allow the State a "reasonable opportunity to rebut [the] implication" the complainant had some other kind of sexual activity that caused the gonorrhea. The State thereafter elicited Dr. Jacob's testimony that the complainant reported she had been sexually abused by Hernandez on numerous occasions over the past seven years and most recently about a week before May 22. The State subsequently elicited Dr. Norberg's testimony that the complainant reported she had been sexually assaulted by Hernandez one week before May 22 and there had been other prior assaults by him.

[¶ 23] In the context of the proceedings in this case, we conclude the trial court's determination that Hernandez had opened the door for limited testimony about his prior sexual misconduct against the complainant was the product of a rational mental process leading to a reasoned decision and was not an abuse of discretion. In response to testimony about the five-day incubation period for gonorrhea, the trial court limited the State to a "reasonable opportunity to rebut [the] implication" the complainant had some other kind of sexual activity that caused the gonorrhea. The pediatricians' testimony about prior sexual assaults by Hernandez, with the most recent assault about one week before May

22, was within the parameters of the door opened by Hernandez. Although the reference to assaults over the previous seven years may have stretched the temporal limits of the opened door, we are not persuaded any possible error in that limited reference to seven years was reversible error. The trial court instructed the jury about the use of that evidence:

The State of North Dakota charged this defendant with Gross Sexual Imposition occurring on or about May 22, 2003, for a specific occurrence between the defendant and [the complainant]. [The complainant] did not testify about any other past incidents that occurred with this defendant.

However, pursuant to certain questions asked of Dr. Anila Jacob, and her answers, the question arose as to how [the complainant] acquired gonorrhea, which takes five days to incubate. In order to present one possible explanation as to how [the complainant] acquired gonorrhea, Dr. Anila Jacob and Dr. Alonna Norberg were allowed to testify as to the medical history provided to them by [the complainant]. The testimony of Dr. Jacob and Dr. Norberg was offered for this specific purpose only. This testimony should not be considered by you in your determination of the ultimate fact as to whether or not the defendant is guilty of the crime charged in the Information on the date in question, May 22, 2003.

[¶ 24] A jury is generally presumed to follow instructions, and a curative instruction to disregard certain evidence is generally sufficient to remove improper prejudice. *State v. Ellis*, 2001 ND 84, ¶ 23, 625 N.W.2d 544; *State v. Asbridge*, 555 N.W.2d 571, 575 (N.D.1996). Here, the jury was specifically instructed about the limited use of the testimony by Dr. Jacob and Dr. Norberg. During clos-

ing argument, the State did not unduly focus on their testimony about Hernandez's prior sexual misconduct against the complainant. Rather, the State briefly argued it charged Hernandez with "an assault occurring on May 22, 2003, not something that happened before that, so we're asking you to focus on what happened on May 22, 2003, but you needed to have a perspective on how [the complainant] might have gotten the gonorrhea that the doctors found."

[¶ 25] This case involved two conflicting theories of the event. The State presented evidence that Hernandez committed gross sexual imposition and Hernandez claimed that he did not engage in any sexual activity with the complainant on May 22, 2003. Although this case involved conflicting factual theories and credibility issues, from our review of the record, we are not persuaded the pediatricians' limited testimony about Hernandez's prior sexual activity with the complainant was reversible error. Dr. Jacob testified the complainant suffered bruising inside the vulva area, which she testified was consistent with forced sexual contact. The English translation of Hernandez's Spanish letter includes incriminating statements that he admitted to sexual acts with the complainant and he viewed those sexual acts with the twelve-year-old girl as consensual. Section 12.1–20–03, N.D.C.C., makes it a crime to have sexual contact with a person who is less than 15 years old regardless of consent. *See Schill*, 406 N.W.2d at 660. We have carefully reviewed the entire record in this case, and we are not persuaded the trial court abused its discretion in admitting limited testimony about Hernandez's prior sexual activity with the complainant, which was admitted in response to Hernandez's question about the incubation period for gonorrhea. Moreover, in the context of this record and the court's curative instruction,

we are not persuaded any error in the limited reference to prior sexual abuse was reversible error.

V

[¶ 26] Hernandez argues the trial court erred in allowing the State to introduce testimony that non-motile sperm was collected from the complainant on May 22, 2003, during the emergency room examination at MeritCare Hospital. Hernandez claims the State permitted the destruction of potentially exculpatory evidence.

[¶ 27] A sexual assault kit was performed on the complainant by MeritCare personnel on May 22, 2003. According to MeritCare personnel, after "debris" collected for the sexual assault kit was gathered and the sexual assault kit had been completed, Dr. Jacob noted dry secretions on the complainant and Dr. Jacob collected a swab from the complainant under Merit-Care's internal procedures in sexual assault cases. According to MeritCare personnel, the swab was in addition to the usual sexual assault kit. The swab was taken to MeritCare's lab for testing, and a MeritCare technician found non-motile sperm. After that test, the technician destroyed the sample.

[¶ 28] Hernandez argues he was not able to test the sample, and without a DNA analysis, the report and testimony that the sample contained non-motile sperm should have been excluded under N.D.R.Ev. 403. Hernandez also argues the destruction of the sample was sanctioned by the State and violated his due process rights under *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The State responds the evidence was relevant and admissible under N.D.R.Ev. 403, and Hernandez failed to prove the evidence was destroyed in bad faith.

[¶ 29] Under N.D.R.Ev. 403, a trial court has broad discretion to balance the probative value of evidence against the risk of unfair prejudice, and we review the trial court's decision under the abuse-of-discretion standard. *State v. Bell*, 2002 ND 130, ¶ 14, 649 N.W.2d 243. We conclude the trial court did not act arbitrarily, unreasonably, or unconscionably in balancing the probative value of the report and testimony about the results of MeritCare's internal tests against the risk of unfair prejudice.

[¶ 30] We also conclude this record does not establish the State violated Hernandez's due process rights. In *Trombetta*, 467 U.S. at 488, 491, 104 S.Ct. 2528, the United States Supreme Court held there was no due process violation for a State's failure to preserve breath samples for a defendant charged with driving under the influence. The Court held there was no evidence of bad faith by the police, the breath samples did not possess an exculpatory value that was apparent before the sample was destroyed, and the sample was not of such a nature that the defendant was unable to obtain comparable evidence by other reasonably available means. *Id.* at 488–90, 104 S.Ct. 2528.

[¶ 31] In *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the United States Supreme Court held that unless a defendant can show bad faith by the police, the failure to preserve potentially useful evidence does not constitute a denial of due process. In *Youngblood*, at 56–57, 109 S.Ct. 333, the preservation of semen samples was at issue. The Court explained the "possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*," and the "exculpatory value of the evidence must be apparent '*before* the evidence was de-

stroyed.' " *Youngblood,* at 56–57, 109 S.Ct. 333 (quoting *Trombetta,* 467 U.S. at 489, 104 S.Ct. 2528). The Court said the semen samples were "simply an avenue of investigation that might have led in any number of directions," and the "presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood,* at 57, 109 S.Ct. 333.

[¶ 32] In *State v. Steffes,* 500 N.W.2d 608, 613 (N.D.1993), this Court defined bad faith, as used in cases involving destroyed evidence, to mean the evidence was deliberately destroyed by or at the direction of a State agent who intended to thwart and to deprive the defense of information. Hernandez has not marshaled any evidence to show bad faith by the State. *See Steffes,* at 613–14. Moreover, "the possibility that the semen samples could have exculpated [Hernandez] if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta.*" *Youngblood,* 488 U.S. at 56, 109 S.Ct. 333. We reject Hernandez's due process argument.

### VI

■ [¶ 33] Hernandez argues a search warrant to extract bodily fluid and tissue samples from him was defective. The court initially issued a search warrant authorizing law enforcement to extract bodily fluid and tissue samples from Hernandez; however, hospital personnel refused to take samples from Hernandez without a specific court order authorizing them to take the samples. The State ultimately obtained a court order directing the hospital to take the samples. Hernandez argues the court's later order, issued without an additional affidavit, and the samples taken from him violated his rights

under N.D.R.Crim.P. 41 and the warrant requirements of the state and federal constitutions.

■ [¶ 34] Hernandez raised this issue in his pretrial motion in limine, and the trial court denied his motion. Hernandez did not raise this issue in his motion for new trial, or his first amended motion for new trial. This Court has said that although a motion for new trial is not necessary for appellate review, when a new trial is sought, the party making the motion is limited on appeal to the grounds presented to the trial court in the motion for a new trial. *State v. Jordheim,* 508 N.W.2d 878, 880–81 (N.D.1993). We conclude Hernandez has not preserved issues about the search warrant for appellate review.

### VII

[¶ 35] We affirm the conviction and the order denying Hernandez's motions for a new trial.

[¶ 36] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., concur.

CROTHERS, Justice, concurring specially.

[¶ 37] I concur in the result reached in Part II and join the majority in the remainder of its opinion. I write separately because of my belief it is time we consider adopting *Daubert* and its progeny as the law in North Dakota.

[¶ 38] I agree with that portion of Part II rejecting Hernandez's contention that the supremacy clause of United States Constitution requires this Court to follow *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) when determining ad-

missibility of expert testimony. However, I disagree with the remainder of the majority's opinion regarding *Daubert* and would accept Hernandez's invitation to adopt the federal court's rationale and analysis for determining admissibility of expert testimony.

[¶ 39] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. The question of what constitutes "admissible evidence" is determined by the court, in reliance on the rules of evidence. N.D.R.Ev. 104(a). The rules of evidence, in turn, exist to provide a predictable groundwork for admission of evidence, presentation of witnesses, and the conduct of trials. N.D.R.Ev. 101 and 102.

[¶ 40] The problem developing in North Dakota is that the handling of expert testimony is tending toward anything but predictable because, as explained below, this Court, the district courts, and the practicing bar appear adrift with uncertainty whether proceedings are controlled by the *Frye* test, the plain reading of N.D.R.Ev. 104(a) and 702, *Daubert, Daubert* and *Kumho,* or any combination of the above.

[¶ 41] Admission of expert testimony in North Dakota courts is fundamentally governed by N.D.R.Ev. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 702 is read in conjunction with N.D.R.Ev. 104(a), which requires that the court address "[p]reliminary questions concerning the qualification of a person to be a witness."

[¶ 42] The majority refuses to adopt current federal analysis for expert testimony, instead stating in paragraph 6, "This Court has a formal process for adopting procedural rules after appropriate study and recommendation by the Joint Procedure Committee, and we decline Hernandez's invitation to adopt *Daubert* by judicial decision."

[¶ 43] I am troubled by the majority's conclusion for at least two reasons. First, the version of Fed.R.Evid. 702 considered in *Daubert* and *Kumho* was identical to North Dakota's current Rule 702. *See Daubert,* 509 U.S. at 588, 113 S.Ct. 2786 ("Here there is a specific Rule that speaks to the contested issue. Rule 702, governing expert testimony, provides: 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.' ") and *Kumho,* 526 U.S. at 147, 119 S.Ct. 1167 ("Rule 702 itself says: 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.' ").

[¶ 44] Rule 702, Fed.R.Evid., was amended after *Daubert,* and, in fact, in response to *Daubert. See* Fed.R.Evid. 702 advisory committee's note. However, the 2000 amendments to Fed.R.Evid. 702 cannot be used to cloud the fact it was Rule 702 itself—and not the *Daubert* decision—that changed the federal analytical approach to admission of expert testimony.

*Daubert,* 509 U.S. at 589 and 589 n. 6, 113 S.Ct. 2786 (*Frye* test was "displaced" and "superseded" by Rules of Evidence). This conclusion was acknowledged by our own Court in *City of Fargo v. McLaughlin,* 512 N.W.2d 700, 705 n. 2 (N.D.1994) ("The United States Supreme Court has recently held that the *Frye* test, requiring general acceptance within the relevant scientific community, has been superseded by FREv 702."). From this, I conclude the changes embodied in *Daubert* and *Kumho* were the result of rules of evidence that were identical to North Dakota's rules. I am therefore further compelled to conclude that the decision whether to adopt *Daubert* and its progeny is more appropriately a judicial function for this Court than an assignment to the Joint Procedures Committee.

[¶ 45] Secondly, this Court's failure to follow the federal analysis departs from our long-standing and often stated practice that "we are guided by and give deference to" federal case law interpreting the federal rule when we construe our rule. *Gruebele v. Gruebele,* 338 N.W.2d 805, 811 n. 5 (N.D.1983). *See Malchose v. Kalfell,* 2003 ND 75, ¶ 5, 664 N.W.2d 508 ("Because N.D.R.Ev. 901 is taken from the Federal Rules of Evidence, with minor revision, we also consider federal cases to help interpret our rule.") and *State v. Forsland,* 326 N.W.2d 688, 692 (N.D.1982) ("Rule 404(b) was adopted from the Federal Rules of Evidence, and as such the construction and interpretation placed upon the rule by the federal authorities are entitled to appreciable weight.").

[¶ 46] Given the common text and origin of North Dakota's Rule 702 and the version of Federal Rule 702 applied in *Daubert* and *Kumho,* I see no reasonable basis for this Court's reluctance to at least consider, if not embrace, the federal interpretation.

[¶ 47] I also have trouble with the majority's inflexibility on this issue because of this Court's evidentiary rules and opinions that contain or have incorporated, in whole or in part, significant portions of the *Daubert* and *Kumho* doctrines. The *Daubert* Court focused on the admissibility of scientific expert testimony and held that such testimony is admissible only if it is both relevant and reliable. 509 U.S. at 589, 113 S.Ct. 2786. It further held that the federal rules of evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786.

[¶ 48] In *Kumho,* the Court extended *Daubert* to include all expert testimony, holding, "In *Daubert,* this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.' The initial question before us is whether this basic gatekeeping obligation applies only to 'scientific' testimony or to all expert testimony. We, like the parties, believe that it applies to all expert testimony." *Kumho,* 526 U.S. at 147, 119 S.Ct. 1167 (internal citations omitted).

[¶ 49] Rule 104(a), N.D.R.Ev., imposes a "gatekeeper" function much like that discussed in *Daubert* and *Kumho.* Not surprisingly, opinions from this Court recognize as much. *See State v. Zimmerman,* 516 N.W.2d 638, 642 (N.D.1994) ("Whether a blood test was fairly administered is a preliminary question of admissibility left to the discretion of the trial judge.") and *State v. Miller,* 466 N.W.2d 128, 131 (N.D.1991) ("The trial court controls admission and exclusion of evidence.").

[¶ 50] The North Dakota Rules of Evidence and cases from this Court also require as a prerequisite to admissibility that an expert's testimony be both relevant and

reliable. *See* N.D.R.Ev. 402 ("All relevant evidence is admissible.... Evidence which is not relevant is not admissible.") and *State v. Burke*, 2000 ND 25, ¶ 18, 606 N.W.2d 108 ("DNA test results may be inadmissible if the means used in the particular case were not sufficiently reliable.").

[¶ 51] My reading of both our rules of evidence and these cases suggests that this Court should act on calls to decide whether North Dakota will adopt, in whole or in part, the so-called *Daubert* and *Kumho* doctrine. Our failure to do so leaves a void that is not in keeping with Rule 102, N.D.R.Ev., requiring construction of the rules of evidence "to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence, to the end that the truth may be ascertained and proceedings justly determined."

[¶ 52] Daniel J. Crothers