Filed 2/28/07 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2007 ND 25

State of North Dakota, Plaintiff and Appellee

v.

Mark Streeper, Defendant and Appellant

No. 20060162

Appeal from the District Court of Burleigh County, South Central Judicial District, the Honorable Bruce B. Haskell, Judge.

AFFIRMED.

Opinion of the Court by Sandstrom, Justice.

Julie Lawyer (on brief) and Cynthia M. Feland (argued), Assistant State’s Attorneys, Courthouse, 514 East Thayer Avenue, Bismarck, N.D. 58501-4413, for plaintiff and appellee.

Kent M. Morrow, 411 North Fourth Street, P.O. Box 2155, Bismarck, N.D. 58502-2155, for defendant and appellant.

State v. Streeper

No. 20060162

Sandstrom, Justice.

[¶1] Mark Streeper appealed the district court judgment after a jury found him guilty of manslaughter and delivery of alcohol to a minor.  Concluding that when a person puts another in danger, such as by unlawfully injecting her with drugs, and then does nothing to aid her in the resulting medical crisis, the failure to take appropriate action may be considered as a continuation of criminal conduct.  We affirm.

I

[¶2] Streeper was charged in connection with the death of a 16-year-old girl, A.B.

[¶3] At trial, Streeper testified that he met A.B. while they were co-workers at a local restaurant.  Streeper was 26 years old.  K.U., who was A.B.’s friend and also a minor, testified that after picking up A.B. in Mandan, Streeper purchased some beer and took A.B. and K.U. back to his parents’ house in Bismarck.  K.U. testified that Streeper gave A.B. a pill while they were riding from Mandan to Bismarck, but she said she did not know what kind of pill it was.  K.U. testified that after they all had consumed some of the beer in Streeper’s basement bedroom, she was in the upstairs bathroom with Streeper and watched him crush some pills, mix them with water, and then fill a syringe with the mixture.  By that time, other people had arrived at the Streeper residence.  Three witnesses testified that they watched Streeper inject A.B.’s arm with a syringe:  K.U. and Stephanie Huft, both friends of A.B.’s; and Jason Stenehjem, Streeper’s friend since elementary school.  Streeper testified that A.B. injected herself.

[¶4] K.U. testified that Streeper drove her home and that A.B. remained with Streeper and Stenehjem.  Stenehjem testified that upon their return to Streeper’s home, Streeper began giving A.B. a back massage.  At that point, Stenehjem testified, Streeper asked him to leave, so he left.  Streeper testified that A.B. asked him if she could “crash” at his house and that he allowed her to stay.  Streeper testified that he was awakened from sleeping in his computer chair when his telephone rang at around 11:30 the next morning.  Streeper said that the restaurant manager was looking for A.B. because her mother had called the restaurant after she realized A.B. had failed to come home the night before.  Streeper testified that he was unable to awaken A.B. and that he checked her pulse, propped her head up with a towel, and “blew into her mouth a couple times.”  A paramedic testified that A.B. was dead when he arrived at the scene.

[¶5] According to police testimony, a camera found in Streeper’s room revealed that someone had taken digital photographs of A.B. shortly after 4 a.m. as she was lying partially nude on his bed.  The camera’s internal clock was not set to the correct time, so a police investigator had to examine the camera to calculate the actual time the photos had been taken.  At trial, Streeper admitted to having taken the photos.

[¶6] Dr. George Mizell, the state forensic examiner, testified that A.B. died from “a mixed drug intoxication of the drugs Oxycodone, Methadone, and Alprazolam.”  Oxycodone is commonly sold under the brand name Oxycontin.  Dr. Mizell testified that although no specific method exists to determine whether those drugs were administered orally or by injection, the toxicity levels were “much higher than . . . typically see[n] with oral administration . . . .”  He testified that A.B.’s right arm had bruising consistent with a needle puncture.  He also testified that A.B. had a blood-alcohol content of 0.26 percent.

[¶7] Streeper admitted that he had prescriptions for Alprazolam and Methadone.  A police investigator testified that he found several empty pill bottles for Methadone, Oxycontin, Delaudid, and other drugs in Streeper’s room.  Stenehjem testified that A.B. had a “whole handful” of Oxycontin and offered to sell him some.  Streeper testified that he had recently purchased Oxycontin and that on that night he had crushed four of those pills with a spoon, stirred them in water with a syringe plunger, sucked the mixture through a cotton ball into a syringe, and injected himself with it.  The investigating officers testified that they found two spoons in an exhaust fan in the ceiling of Streeper’s bathroom.  Both spoons tested positive for Oxycodone.

[¶8] The jury found Streeper guilty of manslaughter and two counts of delivery of alcohol to a minor.  Streeper appeals.

[¶9] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27-05-06.  This appeal is timely under N.D.R.App.P. 4(b).  This Court has jurisdiction under N.D. Const. art. VI, § 2, and N.D.C.C. § 29-28-06.

II

[¶10] Streeper argues that the district court erred in making evidentiary rulings.

[¶11] We review a district court’s evidentiary ruling under an abuse-of-discretion standard.  
State v. Ramsey
, 2005 ND 42, ¶ 8, 692 N.W.2d 498.  “Under N.D.R.Ev. 401, 402, and 403, a district court has broad discretion in admitting or excluding evidence.”  
State v. Charette
, 2004 ND 187, ¶ 12, 687 N.W.2d 484 (citations omitted).  “A trial court abuses its discretion in evidentiary rulings when it acts arbitrarily, capriciously, or unreasonably or if it misinterprets or misapplies the law.”  
Ramsey
, at ¶ 8 (citations omitted).

A

[¶12] Streeper argues that the district court erred by admitting photos of A.B., because the State was using them to “impeach” his credibility prior to his testimony, and that their admission “forced” him to testify.

[¶13] “[T]he use and admission of photographs in criminal trials is largely within the discretion of the trial court.”  
State v. Ohnstad
, 359 N.W.2d 827, 839 (N.D. 1984) (collecting cases).  This Court has said:

It appears to be a well-settled rule that photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question, are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, condition and identification of the body, even though such photographs may have the additional effect of tending to excite the emotions of the jury.

Id.
 (quoting 
State v. Iverson
, 187 N.W.2d 1, 37 (N.D. 1971) (omitting citations)).

[¶14] Outside the presence of the jury, the district court ruled on Streeper’s objection to the State’s offer of the digital photos:  “they’re relevant both to the substance of the charges and to the defendant’s credibility . . . .”

[¶15] Streeper’s argument that the admission of the photographs forced him to testify fails.  Following his logic, every criminal defendant would be “forced” to testify, because the State must produce evidence obviously adverse to the defendant to prove every element of the offense beyond a reasonable doubt.  
See
 N.D.C.C. § 12.1-01-03(1).

[¶16] Also misplaced is Streeper’s use of the term “impeachment” to describe the State’s actions to build its case in chief, especially since Streeper, a potential defense witness, had not yet testified.

[¶17] In building its case against Streeper, the State questioned police officers who interviewed him at the scene and later at the police station.  The officers’ trial testimony reveals that Streeper told them he was asleep at a time when the State argued he was awake:

[Officer Hellman:] I heard the part where he said A.B. had fallen asleep on the bed and that he had covered her up with a blanket and then he said he played on the computer until four in the morning and then he had went to sleep. . . . [H]e claimed that he had been sleeping in a chair from four o’clock in the morning on until whenever.

. . . .

[Officer Stugelmeyer:] I asked him when the last time he saw A.B. alive and he said that it was last night at about 12:15 to 12:30 is what he said.

. . . .

[The State:] What explanation did he give you for the camera and some of the pictures on the camera?

[Officer Stugelmeyer:] [At the police station,] I started asking him about that, he asked could you make yourself more clear. At that point — I can’t remember exactly how he said but he acknowledged that there was a camera there and then basically didn’t want to talk with us any further.

[¶18] Streeper’s statements to law enforcement qualify as an “admission by a party-opponent” under Rule 801(d)(2), N.D.R.Ev.  The photographs were admissible, substantive, non-hearsay evidence that could be used to prove Streeper was awake and, as the State argues, was taking pictures of A.B. as she was dying of a drug overdose.  A statement of a criminal defendant is admissible even though the defendant intended it to be exculpatory when made.  
See
 
Auto-Owners Ins. Co. v. Jensen
, 667 F.2d 714, 722 (8th Cir. 1981) (A statement need not have been against a party’s interest at the time it was made so long as it is against his interest at trial.).

[¶19] The State’s witnesses included Dr. Ronald Tello, the Burleigh county coroner, and Dr. George Mizell, who actually performed the autopsy and determined the cause of death.  Dr. Tello testified about his actions and observations when he arrived at the scene around 12:20 p.m. that day.  The State asked him to compare a photo taken from the camera in Streeper’s room to photos taken by the police.  Dr. Tello noted that A.B.’s head and neck were in exactly the same position in both sets of photos.  He also noted the presence of typical post-death discoloration on A.B.’s body and that the coloration was much darker in the police photos.

[¶20] The digital photographs found in the camera in Streeper’s room were relevant to attack Streeper’s statements to law enforcement.  The photos provided corroborating evidence supporting the State’s theory that he was awake and aware that A.B. was suffering a drug overdose.

[¶21] The district court did not abuse its discretion by admitting the photographs.

B

[¶22] Streeper argues the district court erred by allowing a detective to testify as an expert in the analysis of the digital photos.

[¶23] The decision whether to admit expert witness testimony rests within the district court’s sound discretion and will not be reversed unless the court has abused its discretion.  
State v. Schmidkunz
, 2006 ND 192, ¶ 15, 721 N.W.2d 387.  “Rule 702, N.D.R.Ev., envisions generous allowance of the use of expert testimony if the witness is shown to have some degree of expertise in the field in which the witness is to testify.”  
State v. Hernandez
, 2005 ND 214, ¶ 8, 707 N.W.2d 449 (citation omitted).  “If a witness is not testifying as an expert, the witness’ testimony in the form of opinions or inferences is limited to those opinions or inferences that are (i) rationally based on the perception of the witness and (ii) helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue.”  N.D.R.Ev. 701.

[¶24] In this case, the State did not offer Officer Mark Gaddis as an expert.  Officer Gaddis did testify about his 40-hour training course.  He also testified that he compared the camera’s internal clock to his own clock and then used the disparity to calculate when the photos were actually taken.  The district court said:  “I don’t believe expert testimony is necessary.  I believe the jury can decide themselves whether the training and experience of Officer Gaddis would allow him to come to the conclusions that he did.”

[¶25] The district court did not admit Gaddis as an expert, but allowed him to testify as a lay witness about calculating the actual time the photos were taken.  The district court did not abuse its discretion by allowing Officer Gaddis to draw conclusions and state lay opinions permitted by N.D.R.Ev. 701, because they were rationally based on his perception and were helpful to the jury’s determination of fact.

III

[¶26] Streeper argues that the district court erred in denying his motion for acquittal for the State’s failure to prove prima facie causation.

[¶27] Streeper moved for an acquittal under N.D.R.Crim.P. 29, preserving the issue of sufficiency of the evidence for appellate review.  
See
 
State v. Steen
, 2000 ND 152, ¶ 16, 615 N.W.2d 555.  “This Court will reverse a conviction on the ground of insufficient evidence only if, after viewing the evidence and all reasonable inferences in the light most favorable to the verdict, no rational factfinder could have found the defendant guilty beyond a reasonable doubt.”  
Id.
 at ¶ 17 (citation omitted).

[¶28] “A person is guilty of manslaughter, a class B felony, if he recklessly causes the death of another human being.”  N.D.C.C. § 12.1-16-02.

[¶29] Dr. Mizell performed the autopsy and determined the cause of death.  He testified that A.B.’s right arm had an injury consistent with a needle puncture.  He testified about the results of the toxicology report:

In this case, analysis of the blood both at the state toxicology lab and the outside laboratory detected the presence of Oxycodone and in addition in the blood specimen itself, was detected Methadone and Alprazolam, all in significant levels.  In fact, the Oxycodone level was a level that would be associated with potential death.  The Methadone level was also at a relatively high level — would have been potentially toxic at the levels that were detected in her bloodstream and the Alprazolam, again another drug that can cause toxicity, was present in an elevated level in her body.

. . . .

[Dr. Mizell:]  The Oxycodone was detected at a level of 560 nanograms per milliliter.

[The State:]  Would that be consistent with a therapeutic dose?

[Dr. Mizell:]  No it would not.  It’s much higher than we would see with a therapeutic administration of Oxycodone.

[The State:]  Okay.  What about the Methadone?

[Dr. Mizell:]  The Methadone was detected at a level of 64 nanograms per milliliter.

[The State:]  And would that be classified as a therapeutic dosage?

[Dr. Mizell:]  In individuals who are receiving Methadone in therapy, that would be a potential level that could be seen with therapeutic administration.  However, in a person who is not taking Methadone, the detection of the drug itself would be unusual and it is at a level that could be potentially toxic.

[The State:]  And what about the Alprazolam?

[Dr. Mizell:]  The Alprazolam is at an elevated level.  It is at a level that is seen with therapeutic administration of the drug.  Again, also it’s at a level that may have the side effects that I mentioned, including central nervous system depression.

. . . .

The cause of death was listed as mixed drug intoxication with the drugs Oxycodone, Methadone, and Alprazolam listed as the intoxicants.

On cross-examination, the defense questioned Dr. Mizell about how the drugs were introduced into A.B.’s system:

[Dr. Mizell:]   There’s not a specific way that I could determine that the drugs were injected versus taking them in an oral fashion, however the levels are much higher than we typically see with oral administration of those drugs.

[Streeper:]   Have you ever seen levels that high through oral ingestion of medication?

[Dr. Mizell:]  Yes I have.  With ingestion of large quantities of the pills, you may see levels as high as what we found in this case.

[¶30] In denying Streeper’s motion, the district court summarized the evidence against him:

Well there’s evidence of certain controlled substances being in Mr. Streeper’s residence, there’s evidence that he was crushing some sort of pill on a spoon, there’s evidence that that got into a syringe, there’s evidence that Mr. Streeper injected something into A.B., there’s evidence as to what was found in her system, that’s up to the jury to determine whether all of those factors amount to causation.

[¶31] The district court properly denied Streeper’s motion for acquittal.

IV

[¶32] Streeper contends the district court reversibly erred by permitting the State to “argue” that he recklessly caused the death of A.B. by his failure to render aid to her as she was suffering a drug overdose.

[¶33] Streeper repeatedly objected during the State’s case in chief regarding the introduction of evidence about the State’s theory of the case—that in addition to unlawfully injecting A.B. with drugs, he did nothing to help her in the hours after that, which contributed to her death.  Streeper argues that “[b]y refusing to order the State to no longer advance that theory, and permitting them to argue for it in 
closing argument
 . . . the Court permitted a patina of legitimacy to be attached to the theory. . . . one can easily infer that the verdict may have been based upon this theory.”  (Emphasis added).

[¶34] In 
State v. Schmidkunz
, we explained our standard for reviewing closing arguments:

In controlling the scope of closing argument, the district court is vested with discretion, and absent a clear showing of an abuse of discretion, we will not reverse [the conviction] on grounds the prosecutor exceeded the scope of permissible closing argument.  Unless the error is fundamental, a defendant must demonstrate a prosecutor’s comments during closing argument were improper and prejudicial.  In order to be prejudicial, the improper closing argument must have stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case that has support in the evidence.

State v. Schmidkunz
, 2006 ND 192, ¶ 7, 721 N.W.2d 387 (internal quotations and citations omitted).  In 
Schmidkunz
, the defendant did not object during closing argument after the prosecutor made a comment about evidence not admitted at trial.  
Id.
 at ¶ 5.  The district court realized the impropriety of the comment and then “instructed the jury that statements by counsel were not to be considered evidence, any statements by counsel concerning facts not supported by the evidence were to be disregarded, and jury members were to rely on their own recollection or observation.”  
Id.
 at ¶ 11.  On appeal, we reviewed the district court’s actions for obvious error.  
Id.
 at ¶¶ 6-7.  We concluded the comment was not so prejudicial as to affect Schmidkunz’s substantial rights:

The evidence against Schmidkunz was overwhelming, and we cannot say that the prosecutor’s single comment, which did not state any specific evidentiary facts, carried with it enough weight to impact the jury’s verdict and Schmidkunz’s ability to receive a fair trial. Schmidkunz has failed to demonstrate the prosecutor’s remarks affected his substantial rights.

Based upon our review of the record, we are unable to conclude the State’s improper comment in closing argument prejudiced Schmidkunz.  We therefore, conclude Schmidkunz was not denied a fair trial by the prosecutor’s comment and the claimed error does not rise to the level of obvious error requiring reversal.

Id.
 at ¶¶ 11-12.

[¶35] The following dialogue between the district court and Streeper’s counsel prior to closing arguments summarizes the district court’s previous rulings on Streeper’s objections about the failure to render aid:

THE COURT: There’s a difference between contributing to a death by not doing anything as opposed to a legal — well a criminal liability for — I guess what I’m getting to is you can — if you recklessly act and that causes somebody’s death, 
I guess it’s up to the jury to decide what part of that continuum is the act.
  I’m not inclined to give an instruction regarding legal duty because I think that would be more confusing than what you’re saying.

MR. MORROW: I think what the State is arguing is that not that he took action but that he — there was an omission in doing anything — that he should have known that when those pictures were taken at four o’clock in the morning that she was in distress and did something about it to get her medical attention, and then recklessly caused her death.  So I think if they’re not instructed that legally he has no legal obligation to do that —

THE COURT: Well again that’s two different concepts where you’re talking about a legal obligation to do or not do something as opposed to whether his action or inaction was a reckless action that contributed to her death.  That’s two totally different things.  The State could argue what you just said.  What I said earlier is I’m not allowing them to argue that there’s some legal duty or obligation to act or not act but 
that doesn’t prohibit them from arguing that his actions were reckless and contributed to her death — or his lack of action
.

MR. MORROW: No, I can understand that but I don’t know how you can be reckless in failing to do something unless you have a legal obligation to do it.

THE COURT: Well I mean reckless has a definition and the jury will have to apply that definition.

(Emphasis added).

[¶36] In its closing argument, reproduced in part below, the State followed the district court’s instructions and did not contend there was a legal duty to render aid.  The State said that Streeper unlawfully injected A.B. with drugs and then did nothing to help her:

A.B. was 16 years old.  She is a child.  Mark was 26.  I don’t care if he’s been using drugs since he was 16 years old.  He is the one, that by his conduct, gave her the lethal dose — that gave her the drugs that caused her death.  It doesn’t matter if she didn’t say no I don’t want the drugs.  She had no idea what she was getting herself into.  Mark Streeper knew.  He’s seen people overdose.  He saved his own friend, yet what did he do here?  Nothing.  When that girl went through that agonal period, what did he do?  Nothing.  He gave her the drugs, he didn’t do anything to help her.  He caused her death.

Streeper did not object during the State’s closing argument.

[¶37] Under N.D.C.C. § 12.1-02-01:

1. A person commits an offense only if the person engages in conduct, including an act, an omission, or possession, in violation of a statute which provides that the conduct is an offense.

2. A person who omits to perform an act does not commit an offense unless the person has a legal duty to perform the act, nor shall such an omission be an offense if the act is performed on the person’s behalf by a person legally authorized to perform it.

In some very limited instances, a person can be held criminally liable 
solely
 for failing to render aid to another.  
See, e.g.
, N.D.C.C. § 39-08-06 (duty of driver to give information and render aid after a motor vehicle accident resulting in death or serious injury); 
see also, e.g.
, N.D.C.C. § 14-07-15 (establishing criminal liability for parents’ willful failure to furnish medical attention to their child).  A person can be held civilly liable for failing to render aid to someone he knew or had reason to know was put in danger by his conduct.  
See
 
South v. Nat’l R.R. Passenger Corp. (AMTRAK)
, 290 N.W.2d 819, 837 (N.D. 1980) (“If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm.”).

[¶38] Streeper’s contention that “North Dakota law does not impose a legal obligation to render aid or assistance to a person in apparent need” is an imprecise statement of law in light of the facts and manslaughter charge in this case.  The State’s theory of the case was not predicated on criminal liability solely for the failure to render aid; instead, the State contends the failure to render aid could be considered as a continuation of criminal conduct and it contributed to the cause of A.B.’s death.

[¶39] The jury heard eyewitness testimony that Streeper injected A.B. with a syringe.  A.B. did not immediately die from the injection.  The medical examiner could not pinpoint a precise time of death.  Streeper was alone with A.B. after Stenehjem left that night.  The jury could have rationally found that Streeper knew or had reason to know that A.B. was in distress hours before he had his mother call 911, because he testified about having saved Stenehjem’s life after a drug overdose and because police found a camera in Streeper’s room containing several digital photos of A.B. taken shortly after 4:00 that morning.  A jury could have reasonably concluded that he was familiar with overdose symptoms and was awake when A.B. was in a medical crisis.

[¶40] Whether Streeper’s conduct in failing to render aid to A.B. rises to the level of criminal negligence or recklessness was within the province of the jury.  The jury was given a choice of finding Streeper guilty or not guilty of manslaughter, negligent homicide, or reckless endangerment.  It also received statutory definitions of the various associated culpability levels.  The State made a fair and reasonable argument based upon its theory of the case and the district court’s ruling throughout the trial and prior to closing arguments.  The State’s theory has support in the evidence.  The State made no improper comments during closing argument.  The district court did not abuse its discretion in its control of the scope of closing argument.

V

[¶41] Streeper argues that “the trial court erred when it refused to instruct the jury on the lesser-included offense of misdemeanor reckless endangerment.”

[¶42] A person is guilty of reckless endangerment if:

he 
creates a substantial risk of serious bodily injury or death to another. 
 The offense is a class C felony if the circumstances manifest his extreme indifference to the value of human life.  Otherwise it is a class A misdemeanor.  There is risk within the meaning of this section if the potential for harm exists, whether or not a particular person’s safety is actually jeopardized.

N.D.C.C. § 12.1-17-03 (emphasis added).  The district court reasoned that only the misdemeanor reckless endangerment was an included offense of manslaughter, because “extreme indifference is not an element necessary to prove manslaughter.”  On reckless endangerment, the court instructed:

If you find the defendant Not Guilty of both Manslaughter and Negligent Homicide, you are to consider the offense of Reckless Endangerment, a crime that is necessarily included in the offense of Manslaughter, the essential elements of which are as follows:

1. On or about the 28
th
 - 29
th
 day of November, 2004;

2. In Burleigh County, North Dakota;

3. The defendant, Mark Streeper;

4. 
Created a substantial risk of serious bodily injury or death to another.

(Emphasis added).

[¶43] Because the district court instructed the jury on misdemeanor reckless endangerment, Streeper’s argument is moot.

VI

[¶44] We affirm the district court’s judgment.

[¶45] Dale V. Sandstrom

Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

Gerald W. VandeWalle, C.J.