2013 ND 77

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Miguel Humberto Medina ROMERO, Defendant and Appellant.**

**No. 20110337.**

Supreme Court of North Dakota.

May 14, 2013.

Rehearing Denied May 29, 2013.

Barbara L. Whelan, State's Attorney, Grafton, N.D., for plaintiff and appellee.

Benjamin C. Pulkrabek, Mandan, N.D., for defendant and appellant.

SANDSTROM, Justice.

[¶ 1] Miguel Humberto Medina Romero appeals from criminal judgments entered after a jury convicted him of murder, unlawful possession/manufacture of a controlled substance (marijuana), and unlawful possession of a controlled substance (cocaine) with intent to deliver. We conclude the district court did not err in denying Romero's motion to allow the jury to view the crime scene, in instructing the jury on self-defense, and in denying Romero's motion under N.D.R.Crim.P. 29 for a judgment of acquittal on the charge of unlawful possession of cocaine with intent to deliver. We further hold Romero failed to establish reversible error regarding inaudible words in the transcript of the jury selection. We affirm.

I

[¶ 2] In October 2010, the State charged Romero with unlawful possession/manufacture of a controlled substance (marijuana), a class B felony, and murder, a class AA felony. In January 2011, the State amended the charges to add charges of unlawful possession of a controlled substance (cocaine) with intent to deliver, a class A felony, and tampering with physical evidence, a class C felony.

[¶ 3] On October 16, 2010, Romero shot and killed Bryon Kalis. According to trial testimony, Romero and several friends, including juveniles, traveled from Pembina to Grand Forks on October 15, 2010, and rented a hotel room. According to testimony, Romero wanted to purchase marijuana while in Grand Forks. On the basis of information received from Kalis, Romero and C.E., a minor, arranged to meet Lindsey Lafferty in East Grand Forks on October 16, 2010. C.E. testified that Lafferty agreed to get them marijuana in exchange for $240 and five Xanax bars, with C.E. and Romero each contributing half of the $240. However, after receiving the money and bars, Lafferty did not return with the marijuana. Lafferty testified at trial that she had no intention of getting the marijuana and just "ripped them off for the money." She also testified that although she received a threatening text message from Romero, she still had no intention of getting him marijuana. There was testimony at trial that Romero was upset with Kalis for getting him involved with Lafferty. Romero and Kalis then began exchanging text messages, which, according to evidence presented at trial, contained escalating threats.

[¶ 4] According to the testimony, after returning to Pembina from Grand Forks on October 16, 2010, Romero, B.O., B.B., and Jace Brown were at Romero's home when they heard a car with a loud engine driving around or circling the block, revving its engine. Both B.B. and Brown testified at trial that Romero went outside one time to see who it was, but came back inside when no one was there. B.B. and Brown testified that Kalis, the driver of the car, stopped again and yelled for them

to come down and that Romero took his AR15 rifle and gave a handgun to B.O. and went outside. B.B. and Brown testified Kalis pulled up in his vehicle, slammed on the brakes, threw open his car door, and moved quickly toward Romero, waving his arms or fists and yelling at Romero. Kalis also reportedly said, "[J]ust shoot me you . . ., if you're going to shoot me, just shoot me." Romero then shot Kalis. According to the testimony, Romero fired the rifle thirteen times, with a fourteenth shell mis-firing, and eight bullets struck Kalis, kill-ing him. B.B. testified Kalis was three feet from Romero when Romero fired the rifle. Romero called 911 and reported the shooting.

[¶ 5] According to the testimony of a Pembina County deputy sheriff, Romero reportedly said Kalis was trying to break into Romero's home with a baseball bat so Romero shot him. B.B. testified at trial that after getting out of his car, Kalis could have had something in his hand. B.B. was unsure what it was, but testified Kalis did not have a bat. Brown testified Kalis may have had something in his hand and thought he heard something wooden hit the concrete by Kalis's car. After po-lice officers arrived at the scene, a Pembi-na County deputy sheriff found a knife by Kalis's body and a bat a few feet away. A North Dakota Highway Patrol officer took measurements of the crime scene. In in-vestigating the crime scene, officers also searched Romero's house. Upstairs in the house, officers found marijuana plants and paraphernalia used to grow marijuana.

[¶ 6] C.E., who had accompanied Romero to Grand Forks, testified that while at the hotel in Grand Forks he had seen Romero with cocaine. C.E. testified he observed a bag of white powder and money on the table and Romero told him it was cocaine. C.E. testified that in the days after the shooting, B.O. brought a black bag, which C.E. identified as Rome-ro's, to C.E.'s house and that C.E. had taken the cocaine from the black bag and hidden the cocaine under the bridge. C.E. also subsequently led law enforcement offi-cers to the bridge where he had hidden the cocaine from a black bag belonging to Romero. C.E. testified the cocaine was in one big bag and a couple of "designer bags," which were the same kinds of bags Romero had purchased in Grand Forks. C.E. testified it was Romero's cocaine.

[¶ 7] During a jury trial, the district court denied Romero's motion to allow the jury to view the crime scene. At the close of the State's case, Romero moved to dis-miss the charges under N.D.R.Crim.P. 29. The district court granted Romero's mo-tion to dismiss the charge of tampering with physical evidence, but denied his mo-tion on the other three charges. The jury found Romero guilty of the three remain-ing charges.

[¶ 8] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. Romero timely ap-pealed from the criminal judgments under N.D.R.App.P. 4(b). We have jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 29–28–06.

## II

[¶ 9] Romero argues the district court erred in denying his motion to allow the jury to view the crime scene outside his house.

[¶ 10] Section 29–21–26, N.D.C.C., ad-dresses circumstances under which a jury may view the place where an offense alleg-edly has been committed:

> When, in the opinion of the court, it is proper that the jurors should view the place in which the offense was charged to have been committed, or in which any other material fact occurred, it may or-der the jurors to be conducted in a body,

in the custody of proper officers, to such place, which must be shown to them by a person appointed by the court for that purpose, and the officers must be sworn to suffer no person to speak to nor communicate with the jurors, nor to do so themselves, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time. The trial judge must be present and the state's attorney and counsel for the defendant may be present at the view by the jurors.

[¶ 11] The decision to grant a request for a jury view rests in the district court's sound discretion. *State v. Schlickenmayer*, 334 N.W.2d 196, 200 (N.D.1983). The court may deny a request to view the crime scene "when the view would serve no useful purpose in illustrating testimony." *Id.* at 200. A court abuses its discretion if it acts in an arbitrary, unreasonable, or unconscionable manner or if it misinterprets or misapplies the law. *State v. Kleppe*, 2011 ND 141, ¶ 8, 800 N.W.2d 311.

[¶ 12] Romero argues the jury would have benefitted from a viewing of the crime scene where the shooting took place because a viewing would have allowed the jury to better understand the evidence and testimony and would have helped jurors understand the distances measured by law enforcement. Romero essentially argues a crime scene viewing would have helped the jurors visualize the distances better than the law enforcement photographs and representations and contends a viewing was necessary to "complete" his defense.

[¶ 13] The district court admitted exhibits into evidence at trial, including photographs of the area, photographs taken at the crime scene by law enforcement, and photographs of Romero's house. Additionally, a highway patrol officer testified regarding his role in the crime scene investigation, which included measuring various distances of items from the body and producing a scale representation of the scene. The officer's scale drawing was admitted as an exhibit and contains the specific crime scene measurements. In denying Romero's request for a viewing of the premises, the district court stated it reviewed the relevant statute, case law, and the various exhibits, including the photographs and the highway patrol officer's drawing showing the distances. The court concluded the exhibits presented at trial adequately represented the crime scene and the distances involved could be explained to the jury without viewing the premises. The court in essence concluded a viewing of that crime scene would serve no useful purpose in illustrating the testimony.

[¶ 14] We conclude the district court engaged in a reasoned analysis in reaching its decision, did not act in an arbitrary, unreasonable, or unconscionable manner, and did not misinterpret or misapply the law. We therefore hold the court did not abuse its discretion in denying Romero's request to allow the jury to view the crime scene.

### III

[¶ 15] Romero argues the district court erred in its jury instructions in refusing to either change the wording in the self-defense instruction from "great bodily injury" to "serious bodily injury" or give a definition of "great bodily injury."

[¶ 16] "Jury instructions must correctly and adequately inform the jury of the applicable law, and must not mislead or confuse the jury." *State v. Erickstad*, 2000 ND 202, ¶ 16, 620 N.W.2d 136. On appeal, we review jury instructions as a whole to decide whether the instructions "adequately and correctly inform the jury of the applicable law, even though part of

the instruction standing alone may be insufficient or erroneous." *State v. Barth,* 2001 ND 201, ¶ 12, 637 N.W.2d 369. When considered as a whole, if a jury instruction correctly advises the jury of the law, "it is sufficient even if part of it standing alone may be insufficient." *Id.* "Selecting only a part of the instructions without considering the jury instructions as a whole is not proper because it can result in erroneous and misleading inferences." *City of Minot v. Rubbelke,* 456 N.W.2d 511, 513 (N.D. 1990). Further, a district court is not required to give jury instructions in the specific language requested by the defendant. *Id.* at 513.

[¶ 17] Before the district court instructed the jury, Romero objected and requested the court to modify the jury instruction entitled Self–Defense (Reasonableness of Accused's Belief), which stated:

> The Defendant's conduct is to be judged by what the Defendant in good ·faith honestly believed and had reasonable grounds to believe was necessary to avoid apprehended death or *great bodily injury.*

(Emphasis added.) Romero asked the court to change "great bodily injury" to "serious bodily injury," because the latter phrase is used in statutes addressing self-defense and is statutorily defined. Romero further argued in the district court that if the court did not change the instruction, a definition of "great bodily injury" was necessary because the jury would not know the meaning of that term. The transcript, however, does not reflect that Romero proposed to the court a definition of "great bodily injury." The district court refused Romero's request, ruling the instructions as a whole correctly advised the jury of the law.

[¶ 18] The instruction given by the district court is based on a pattern jury instruction, NDJI–Criminal K–3.34, which cites its source as this Court's decision in *State v. Leidholm,* 334 N.W.2d 811, 818 (N.D.1983). This Court, however, has repeatedly cautioned against using pattern jury instructions as "representative statements of substantive law." *Erickson v. Brown,* 2012 ND 43, ¶ 10, 813 N.W.2d 531. We have explained:

> The North Dakota Pattern Jury Instructions are published as a guide by the State Bar Association, in conjunction with the North Dakota Pattern Jury Instruction Commission. The pattern jury instructions are not controlling law, and are published with the caution that they are "neither a restatement nor an encyclopedia of the prevailing law."

*Id.* at ¶ 10 (quoting *State v. Bauer,* 2010 ND 109, ¶ 14, 783 N.W.2d 21). Further, we have observed that a pattern jury instruction may even "contain[ ]. an incorrect statement of the law." *State v. Johnson,* 2001 ND 184, ¶ 7, 636 N.W.2d 391.

[¶ 19] On appeal, the narrow issue raised by Romero is whether the district court committed reversible error in refusing to grant his request for a specific instruction defining the phrase "great bodily injury." In instructing the jury, the court defined "serious bodily injury" as meaning "bodily injury that creates a substantial risk of death or which causes serious permanent disfigurement,. unconsciousness, extreme pain, permanent loss or impairment of the function of any bodily member or organ, a bone fracture, or impediment of air flow or blood flow to the brain or lungs." The district court's definition is consistent with the definition found in N.D.C.C. § 12.1–01–04(29).

[¶ 20] In *Leidholm,* 334 N.W.2d . at 814–19, this Court analyzed the law of self-defense and used the phrases "serious bodily injury" and "great bodily injury" interchangeably, which is consistent with a

recognized definition of "serious bodily injury":

> Serious physical impairment of the human body; esp., bodily injury that creates a substantial risk of death or that causes serious, permanent disfigurement or protracted loss or impairment of the function of any body part or organ. Model Penal Code § 210.0(3). • Typically, the fact-finder must decide in any given case whether the injury meets this general standard. Generally, an injury meets this standard if it creates a substantial risk of fatal consequences or, when inflicted, constitutes mayhem. Cf. mayhem (1).—Also termed *serious bodily harm; grievous bodily harm; great bodily injury*.

*Black's Law Dictionary* 857 (9th ed.2009). In defining "great bodily injury," the same source provides: "See *serious bodily injury*." *Id.* at 856.

[¶ 21] Some courts have also held that the phrase "great bodily injury" is a term commonly understandable to jurors. *See, e.g., People v. Kimbrel*, 120 Cal.App.3d 869, 174 Cal.Rptr. 816, 820 (1981) ("We are persuaded by the long acceptance of 'great bodily injury' as a term commonly understandable to jurors that it has not acquired a technical legal definition requiring in the absence of special circumstances a clarifying instruction."). Even when courts have held these terms may have different meanings, they are more generous to the defendant in suggesting that "serious bodily injury" is greater than "great bodily injury." *See, e.g., State v. Havican*, 213 Conn. 593, 569 A.2d 1089, 1092–93 (1990) ("great bodily harm" within self-defense statute was not equivalent to "serious physical injury," and self-defense instruction limiting "great bodily injury" to "serious physical injury" held reversible error); *State v. Rodriguez*, 121 Wash.App. 180, 87 P.3d 1201, 1204 (2004) (self-defense

instruction held inadequate where only "great bodily harm" definition was in first degree assault instruction, leading to erroneous inference defendant was required to fear probable death, serious permanent disfigurement, or loss of body part or function). Nonetheless, as discussed, under our present case law, the phrases "serious bodily injury" and "great bodily injury" have been used interchangeably and are synonymous. *See Leidholm*, 334 N.W.2d at 814–19.

[¶ 22] We conclude that the jury instructions given in this case are not misleading or confusing and, as a whole, fairly and adequately advised the jury of the applicable law, including self-defense. We therefore conclude the district court did not err in instructing the jury on self-defense.

## IV

[¶ 23] Romero argues the district court erred in denying his N.D.R.Crim.P. 29 motion for judgment of acquittal on the charge of unlawful possession of a controlled substance (cocaine) with intent to deliver.

[¶ 24] Generally, "a motion for judgment of acquittal under N.D.R.Crim.P. 29 at the close of the State's case-in-chief preserves the issue of sufficiency of the evidence for appeal." *State v. Hinojosa*, 2011 ND 116, ¶ 16, 798 N.W.2d 634. Our review of the district court's denial of a motion for judgment of acquittal is well-established:

> "Under N.D.R.Crim.P. 29(a), the district court is authorized, upon the defendant's motion, to 'enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.' *State v. Blunt*, 2010 ND 144, ¶ 12, 785 N.W.2d 909 (quoting N.D.R.Crim.P. 29(a)). To grant a motion for judgment of acquittal under

N.D.R.Crim.P. 29, "'a trial court must find the evidence is insufficient to sustain a conviction of the offenses charged.'" *Id.* (quoting *State v. Maki*, 2009 ND 123, ¶ 7, 767 N.W.2d 852). "When considering a motion for judgment of acquittal, 'the trial court, upon reviewing the evidence most favorable to the prosecution, must deny the motion if there is substantial evidence upon which a reasonable mind could find guilt beyond a reasonable doubt.'" *Id.* (quoting *State v. Hammeren*, 2003 ND 6, ¶ 6, 655 N.W.2d 707). To successfully challenge the sufficiency of the evidence on appeal, "the defendant must show the evidence, when viewed in the light most favorable to the verdict, permits no reasonable inference of guilt." *State v. Gonzalez*, 2000 ND 32, ¶ 14, 606 N.W.2d 873.

*State v. Herzig*, 2012 ND 247, ¶ 12, 825 N.W.2d 235. In reviewing a sufficiency of the evidence challenge, we have further explained:

> When the sufficiency of evidence to support a criminal conviction is challenged, this Court merely reviews the record to determine if there is competent evidence allowing the [trier of fact] to draw an inference reasonably tending to prove guilt and fairly warranting a conviction. The defendant bears the burden of showing the evidence reveals no reasonable inference of guilt when viewed in the light most favorable to the verdict. When considering insufficiency of the evidence, we will not reweigh conflicting evidence or judge the credibility of witnesses.... A [trier of fact] may find a defendant guilty even though evidence exists which, if believed, could lead to a verdict of not guilty.

*State v. Bruce*, 2012 ND 140, ¶ 16, 818 N.W.2d 747 (quotations omitted). "When the verdict is attacked and the evidence is legally sufficient to sustain the verdict, we will not disturb the verdict and judgment even though the trial included conflicting evidence and testimony." *State v. Nakvinda*, 2011 ND 217, ¶ 12, 807 N.W.2d 204.

[¶ 25] Romero argues the district court erred in denying his motion to dismiss the charge of unlawful possession of a controlled substance (cocaine) with intent to deliver, because the evidence failed to establish the cocaine in small baggies in the black bag belonged to him. He contends the cocaine entered into evidence at trial was not found in his possession but was instead found by law enforcement after C.E. had taken them to the bridge where C.E. had hidden the cocaine. Romero asserts that, although C.E. testified he saw Romero with cocaine at the hotel in Grand Forks, there are numerous inconsistencies in C.E.'s testimony and the testimony of other witnesses. Romero contends that even if there had been cocaine on the hotel table, there was no proof at trial it was the same cocaine subsequently found by law enforcement at the bridge. Romero argues there is a lack of evidence connecting him to the cocaine.

[¶ 26] Special Agent Michael Ness, who is with the North Dakota Bureau of Criminal Investigation, testified at trial regarding photographs recovered from a cell phone found at the crime scene, which was identified as Romero's phone. Through Special Agent Ness's testimony, photographs were admitted into evidence showing a white powdery substance in a bag, a scale, a significant sum of cash, a wallet, and a Glock handgun. Special Agent Ness testified the photographs were taken at the same Grand Forks hotel during the time when Romero had rented a room at that hotel. Special Agent Steve Gilpin, also with the North Dakota Bureau of Criminal Investigation, testified he had recovered the 17 individual baggies of co-

caine weighing about 20 grams, and these baggies of cocaine were admitted into evidence. Special Agent Gilpin also testified the cocaine had been submitted to the North Dakota state crime lab for analysis, and the analytical report was also received into evidence.

[¶ 27] Additionally, C.E. testified Romero regularly sold marijuana and drugs. C.E. also testified he saw money and a bag of white powder on the table in Romero's room at the Grand Forks hotel on October 15, 2010, and Romero told him the white powder was cocaine. C.E. testified that after the shooting he obtained the black bag belonging to Romero from B.O. and that the black bag contained items C.E. identified as belonging to Romero. The black bag contained the 17 baggies of cocaine subsequently recovered by Special Agent Gilpin.

[¶ 28] B.B. also testified that on October 16, 2010, while in Romero's residence, he saw little baggies of cocaine on the table that Romero said was cocaine. B.B. also identified bags of cocaine entered into evidence at trial by the "little label on them," the same label he saw at Romero's house. Brown also testified that he was at Romero's home on October 16, 2010, when B.B. was present. Brown testified at one point that, although he did not see any cocaine at the residence, Romero had told him there was cocaine there and that he saw some empty baggies.

[¶ 29] The State also contends compelling evidence of Romero's trafficking of cocaine was presented in an exhibit admitted into evidence containing the text messages exchanged between Kalis and Romero on October 15, 2010. The text messages include an outgoing message sent by Kalis to Romero requesting a "gram of blow." In the responding message, Romero replied, "Yes." In the following message, Kalis replied, "Sexy im

[sic] on my way be their [sic] in an hour." Special Agent Steve Gilpin testified a slang term for cocaine is "blow."

[¶ 30] While there was contradictory and conflicting testimony presented at trial, Romero bears the burden of showing the evidence permits "no reasonable inference of guilt" when viewed in the light most favorable to the verdict. *Bruce*, 2012 ND 140, ¶ 16, 818 N.W.2d 747. Under that deferential standard of review, we conclude there was sufficient evidence for the jury to draw an inference connecting Romero to the cocaine recovered by law enforcement and reasonably tending to prove guilt for the charge of unlawful possession of cocaine with intent to deliver. We conclude the district court did not err in denying Romero's N.D.R.Crim.P. 29 motion for judgment of acquittal.

V

[¶ 31] Romero argues he is entitled to have a trial transcript that "truly discloses" what occurred in the district court. He asserts the transcript does not "truly disclose" what occurred in the district court because the original jury selection transcript initially had over 100 places where the word "indiscernible" appeared. After the notice of appeal was filed, a hearing was held in the district court in June 2012 to ascertain what was said in each place in the transcript where "indiscernible" appeared. Present at the hearing were the trial judge, the court reporter, the prosecutor, Romero, his trial attorney, and his appellate counsel. A corrected transcript was produced after the hearing; however, the word "indiscernible" still appears in approximately 22 places in the jury selection transcript. Romero contends he is entitled to a verbatim trial transcript and asserts he has done what he can in the district court to get a verbatim transcript. The State re-

sponds, however, Romero made no objections regarding jury selection, and the few instances where the word "indiscernible" appears in that transcript are meaningless. The State maintains Romero has wholly failed to provide a reason to continue efforts to correct the transcript and has not shown prejudice to justify a new trial.

[¶ 32] In *State v. Entzi*, 2000 ND 148, ¶ 8, 615 N.W.2d 145, we held that a trial court's failure to conduct jury selection on the record does not alone entitle a criminal defendant to a new trial. In reaching our conclusion, we acknowledged " 'a transcript is important to, but not always essential for, a meaningful appeal.' " *Id.* at ¶ 7 (quoting *Hoagland v. State*, 518 N.W.2d 531, 535 (Minn.1994)). However, we also said:

> Where the record includes a complete transcript of the evidentiary portion of the trial, the appellant's constitutional right to a judicial review of all evidence has not been compromised. As to other untranscribed portions of the record, where there were no contemporaneous objections, the errors were not preserved for appeal.

*Entzi*, at ¶ 7 (quotations and citations omitted); *cf. Smith v. Knutson*, 78 N.D. 43, 50, 47 N.W.2d 537, 540 (1951) (party asserting error on rulings regarding examination of jurors on voir dire must present a record affirmatively showing the rulings are erroneous and prejudicial).

[¶ 33] In this case, the district court conducted jury selection on the record, but certain words were still indiscernible in the corrected transcript. Relying only on N.D.R.App.P. 10, Romero requests this Court to "use its own initiative to correct the omissions in his trial voir dire corrected transcript where the word 'indiscernible' appears." Nonetheless, Romero has not raised any specific issue on appeal

relating to the jury selection process. Additionally, we note that at the conclusion of jury selection, Romero's trial counsel responded affirmatively when asked by the district court if he was satisfied with the jury selection process. Romero has simply not established on appeal any prejudice from the purported failure to submit a verbatim transcript. *See* N.D.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance that does not affect substantial rights must be disregarded."). Further, Romero does not argue or explain on appeal how his substantial rights were affected by lack of a verbatim jury selection transcript.

[¶ 34] We conclude Romero has failed to establish reversible error regarding the trial transcript.

## VI

[¶ 35] The judgments are affirmed.

[¶ 36] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.