2014 ND 156

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Allen RATLIFF, Defendant and Appellant.**

**State of North Dakota, Plaintiff and Appellee**

v.

**Cody Joe Boulduc, Defendant and Appellant.**

**State of North Dakota, Plaintiff and Appellee**

v.

**Nathan Lawrence Ratliff, Defendant and Appellant.**

Nos. 20130332, 20130341, 20130346.

Supreme Court of North Dakota.

July 17, 2014.

Rehearing Denied Aug. 28, 2014.

184

David T. Jones (argued) and Carmell F. Mattison (on brief), Assistant State's Attorneys, Grand Forks, ND, for plaintiff and appellee.

Benjamin C. Pulkrabek, Mandan, ND, for defendant and appellant Allen Ratliff.

Nicholas D. Thornton (argued), Fargo, ND, and Erin M. Conroy (on brief), Bottineau, ND, for defendant and appellant Cody Joe Boulduc.

Mark T. Blumer, Fargo, ND, for defendant and appellant Nathan Lawrence Ratliff.

VANDE WALLE, Chief Justice.

[¶1] In appeals consolidated by this Court, Allen Ratliff and Nathan Ratliff appealed from a criminal judgment and an order denying their motion for a new trial and Cody Boulduc appealed from a criminal judgment after a jury, in a joint trial, found the three men guilty of robbery, burglary, two counts of aggravated assault, theft of property, and felonious restraint. We affirm, concluding the district court did not abuse its discretion in denying the defendants' motions for new trial. We

additionally conclude there was sufficient evidence to sustain the convictions for each charge and that the defendants failed to properly preserve their remaining issues on appeal.

## I

[¶ 2] In the early morning hours of April 30, 2012, three men dressed in face masks, gloves and dark clothing forcibly broke into a Grand Forks home. The occupants, husband and wife Carmen and Sherman Jones, were watching television at the time of the home-invasion. A security system recorded surveillance of the break-in. The masked men kicked in the front door, assaulted the homeowners with wooden tire thumpers and killed the Jones's dog. The assailants demanded money, medications and jewelry; one of the men threatened to kill Carmen.

[¶ 3] The men forced Sherman Jones into the hallway, shoved his face to the floor, bound his hands behind his back with duct tape and forcibly removed his wedding ring. The assailants repeatedly struck him in the back and head with their tire thumpers. He lost consciousness and was not able to identify the attackers. Carmen Jones was also struck in the head and jaw with a tire thumper and kicked in the ribs. One of the assailants duct taped her mouth and bound her hands behind her back and forced her face into a chair. She was also unable to identify the men. The men stole medications, money, jewelry, two televisions, and a Looney Tunes bag, among other items.

[¶ 4] The Grand Forks Police Department investigated and discovered evidence that appeared to link the Ratliffs and Boulduc to the robbery. The three men were arrested. At the jury trial, the Joneses testified three masked men broke into their residence, assaulted them, and stole numerous items. The Joneses testi-

fied they could not identify the three men. Fargo Police Detective Christopher Kunszt testified he was involved in the investigation of a stolen red Hyundai Tiburon belonging to Austin Schindler. The red Tiburon was seen leaving the Jones crime scene. The State presented video surveillance photographs taken at approximately 12:30 a.m. on April 30 from a Fargo gas station showing the Ratliffs associating with individuals driving the red Tiburon. The State presented evidence the Ratliffs purchased gas using Schindler's stolen credit card.

[¶ 5] Grand Forks Police Officer Cody Cannon testified the police received information that, on the morning of the home-invasion, a paper delivery person observed three individuals loading a television into a red Tiburon near the scene of the crime. Officer Cannon testified the delivery person gave a description of the three individuals that "relatively" matched the Ratliffs and Boulduc. The officer also testified the red Tiburon was located near Genevieve Slominski's apartment the day after the robbery. Police had previous information Slominski was dating one of the Ratliffs. Police later recovered the title to a vehicle owned by Carmen Jones in the Tiburon.

[¶ 6] Genevieve Slominski was called to testify by the State. She testified she was friends with the Ratliffs. She testified that in the early morning hours of April 30 the Ratliffs and Boulduc called her phone and repeatedly buzzed her secured apartment door. She let them in and the Ratliffs and Boulduc went to her son's room. The three men looked "worked up" and stressed. Slominski observed a bag, a purse, and what appeared to be jewelry scattered on the bed. She also noticed a black hooded sweatshirt, "a couple black face masks," gloves and medications mixed together in a ziploc bag. She also stated Allen Ratliff told her to get out of the

room. When she left her apartment later in the morning, Slominski observed Boulduc in a small red car.

[¶ 7] Slominski testified Allen Ratliff wanted her to go to Fargo with him that morning. Slominski traveled to Fargo with the Ratliffs and Boulduc in two separate vehicles, including a dark colored Cadillac. On the way to Fargo, Slominski ingested a prescription painkiller given to her by Allen Ratliff. The parties drove to a home owned by Steven Summers, the Ratliffs' brother. Slominski testified people were passing out and using pills at Summers's Fargo home. While in Fargo, Slominski went to Pawn America with the Ratliffs and Boulduc and pawned several items of jewelry given to her by Boulduc. She also learned the Ratliffs or Boulduc stored two televisions in her garage. Slominski testified police later searched her apartment and seized the televisions, and a bat she had never seen before.

[¶ 8] Amber Hamley also was called to testify by the State. Hamley was in a relationship with Nathan Ratliff. Hamley testified she partied with the Ratliffs and Boulduc in Fargo before the robbery and they returned to her Grand Forks apartment the morning of the robbery in a red car with a broken window. Hours before the robbery, the three men went into a back room of her apartment and she overheard Nathan Ratliff discuss robbing someone. Soon after, the Ratliffs and Boulduc left her apartment together.

[¶ 9] Corporal Lindsay Wold of the Grand Forks Police Department testified she searched Slominski's garage and seized a television with a serial number that matched the serial number of one of the Jones's televisions. Corporal Wold also testified she recovered several items that were pawned by Boulduc and Slominski in Fargo, including Sherman's wedding ring. The State introduced pawn slips from Mister Money and Pawn America documenting transactions involving jewelry stolen from the Jones's residence. Corporal Wold also searched Summers's Fargo home and discovered a dark colored Carhartt jacket that matched the description of a coat worn during the robbery, a Hyundai Tiburon owner's manual matching the description of the vehicle used in the robbery, a roll of duct tape and the Jones's jewelry.

[¶ 10] The State additionally presented evidence and testimony that following a traffic stop, police arrested the Ratliffs in the same dark colored Cadillac that was driven to Fargo following the robbery. During a search of the vehicle, officers seized Austin Schindler's stolen driver's license, a baseball bat, a stocking cap, a neoprene mask, numerous gloves, a black bag, a large amount of jewelry, a Looney Tunes bag, and other of the Jones's miscellaneous property.

[¶ 11] During the trial, the jury also viewed silent surveillance video of the break-in. The surveillance did not show the assaults or robbery inside the home. At the close of the State's case, the three defendants moved for judgment of acquittal. The court denied their motions. During deliberations, the jury reviewed the video of the break-in. Without the knowledge of the court, the jury also heard audio from the video that was not played when the video was admitted into evidence. While the court was discussing how to proceed with the case after the audio was discovered, the jury reached a verdict. Prior to receiving the verdict, the court polled each juror in open court to determine whether the jury considered any of the audio in its deliberations. Each juror responded the audio did not affect their deliberations, and several jurors commented they could not understand or hear the audio. The jury returned a guilty

verdict on all counts for all three men. Before sentencing, the defendants filed a motion for a new trial arguing the audio required a new trial. The parties also simultaneously filed a motion for judgment of acquittal. The court denied both motions.

## II

[¶ 12] On appeal, the Ratliffs argue the court erred in denying their motion for a new trial. Boulduc, on the other hand, argues the court committed obvious error when the jury listened to audio that was not heard at trial during deliberations. Boulduc contends the court should have declared a mistrial. The parties did not object or ask for a mistrial when it was discovered the jury heard the audio. Following the verdict, the three parties filed a joint motion for a new trial, but only the Ratliffs appealed from the order denying the motion for a new trial and from the judgment. Boulduc appealed from the judgment. We examine the arguments separately.

### A. Ratliff Brothers

[¶ 13] The Ratliffs contend the district court erred in denying their motion for a new trial based on the inadvertent inclusion of the audio during jury deliberations. "We review a district court's decision on a motion for a new trial under an abuse of discretion standard. The district court abuses its discretion when it acts in an arbitrary, unreasonable, or capricious manner, or misinterprets or misapplies the law." *State v. Zajac*, 2009 ND 119, ¶ 11, 767 N.W.2d 825 (citations omitted).

[¶ 14] In its order denying the motion for a new trial, the district court noted the defendants failed to object to the admissibility of the DVD. The court also found the defendants failed to present any affidavits, testimony, or other evidence to establish they were prejudiced by the audio:

"Defendants merely state that the jury 'may have been biased by the audio.' This Court finds a mere assertion that the jury 'may have been biased' does not satisfy the burden of proof necessary to rise to the level required for a new trial under N.D.R.Crim.P. 33."

[¶ 15] Here, the video of the break-in was originally stipulated to and received into evidence. Due to technical problems in transferring the surveillance footage into DVD format, the actual video entered into evidence was not the original surveillance video, but was instead a taped video recording of the original surveillance video. The surveillance video was re-recorded by the police at the station house. During the process of recording the original surveillance video with a DVR camera, background noise at the police station was also taped. According to the district court, "The audio consisted of a discussion between law enforcement officers as they were making copies of the surveillance video."

[¶ 16] Prior to trial, the parties viewed the tape and were aware it contained audio. The court was not aware the video contained audio. The video was admitted into evidence without limitation during the trial and was shown to the jury without sound. During deliberations the jury requested to review the surveillance video, and the court provided the jury with a DVD player and television to watch the video. While the jury was reviewing the video, the State alerted the court that the DVD may contain audio. After it was discovered the jury heard audio that was not played during trial, the defense did not object or move for a mistrial, but instead agreed with the court's suggestion to poll the jurors.

[¶ 17] There is no indication the audio contained anything prejudicial. Discussions during trial indicate the audio simply

appears to be unintelligible background ambiance from the police station:

THE COURT: Juror No. 14, it came to my attention that the video that was sent in and was offered into evidence had some audio. The audio was not played during the trial and was not offered. Did the jury listen to the audio portion in the jury room?

JURY FOREPERSON: We heard bits and pieces, but we did slow motion pause; so after we did that, we weren't able to hear anything.

THE COURT: So was anything that was on that audio discussed in your deliberations?

JURY FOREPERSON: No, ma'am.

THE COURT: And as it turns out, it's my understanding—I believe Detective Simon said the way he made that was to just transfer it to a DVD format by kind of re-copying it; so any audio wasn't even from the scene. So I just want to know if that was discussed at all, the audio.

JURY FOREPERSON: No. We just heard, like, moving around. It wasn't really, like, words.

THE COURT: Okay. It was not considered—

JURY FOREPERSON: Yeah.

THE COURT: —is that correct?

JURY FOREPERSON: Correct.

Following this discussion, each individual juror was polled, and each stated the audio was not considered in their deliberations or that they could not hear or understand the audio. In the order denying the defendants' motion for a new trial, the district court further noted, the members of the jury were "not influenced by the audio" or were "unable to even discern the audio."

[¶ 18] The defendants were aware the surveillance video contained audio, stipulated to the admission of the video, did not object to the jury reviewing the video in deliberations, did not object after the jury heard the audio, did not request a mistrial, and agreed with the court to poll the jury. Most significantly, given the fact there is no indication the audio contained anything prejudicial, we conclude the district court did not abuse its discretion in denying the defendants' motion for a new trial. The court did not act in an arbitrary, unreasonable, or capricious manner, nor did the court misapply the law.

## B. Boulduc

[¶ 19] Boulduc, who appealed only from the judgment of conviction, admits none of the parties objected after it was discovered the jury listened to the audio that was not in evidence. "A failure to object will limit our inquiry on appeal to determining if the alleged error constitutes obvious error affecting substantial rights." *State v. Doppler*, 2013 ND 54, ¶ 14, 828 N.W.2d 502. This Court exercises its power to consider obvious error cautiously and only in exceptional situations in which the defendant has suffered a serious injustice. *State v. Hernandez*, 2005 ND 214, ¶ 13, 707 N.W.2d 449. "We will not find obvious error unless an appellant meets the burden of showing: '(1) error, (2) that is plain, and (3) that affects substantial rights.'" *Doppler*, 2013 ND 54, ¶ 14, 828 N.W.2d 502 (quoting *State v. Doll*, 2012 ND 32, ¶ 11, 812 N.W.2d 381). "[E]ven if the defendant establishes obvious error, we will not exercise our discretion to correct the error unless it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *State v. Roe*, 2014 ND 104, ¶ 10, 846 N.W.2d 707 (quoting *State v. Paul*, 2009 ND 120, ¶ 11, 769 N.W.2d 416).

[¶ 20] Boulduc argues that under *State v. Lindeman*, 64 N.D. 518, 254 N.W. 276, 280 (1934), the reception of any evidence by the jury in a criminal case outside of

evidence presented at trial requires a new trial. In *Lindeman*, the defendant was charged with liquor trafficking during prohibition. At trial, the State offered into evidence a cardboard box containing numerous bottles of "intoxicating liquors." *Id.* at 278. The box and its contents had been exhibits in a different case. The box of alcohol was offered into evidence by the State but the court sustained the defendant's objection to its admission. During deliberations, the box and its contents were inadvertently given to the jury and marked as exhibits. *Id.* "[T]he cardboard paper box, with contents and labels, was taken to the jury room with the exhibits in the case, left with the jury through the entire deliberation, and returned with the exhibits into court when the verdict was rendered." *Id.* Lindeman was convicted and appealed.

[¶ 21] On appeal, this Court noted Lindeman was charged with "engaging in the liquor traffic," even though the complaint alleged he possessed a small quantity of alcohol, and the sheriff's inventory showed law enforcement seized only about one and a half ounces of alcohol. *Id.* at 281. "[T]his small quantity of alcohol was sent to the jury with the large quantity of alcohol contained in the cardboard paper box, and in the circumstances it would unconsciously, if not consciously, affect the jury in this case where the defendant is charged with 'engaging in the liquor traffic.'" *Id.* This Court reasoned, although the ounce and a half of alcohol in Lindeman's possession was not much evidence of liquor trafficking, when combined with the alcohol in the box, "[i]t supplies the occasion for injurious suspicions, and it is the policy of the law to avoid any occasion for outside influence or any occasion wherein it might be said that outside evidence influenced the verdict." *Id.* This Court also declined to consider an affidavit signed by some of the jury members stating the ver-

dict was not based on the contents of the box. *Id.* at 279. Given the prejudicial admission of the box of alcohol, this Court reversed the judgment and ordered a new trial.

[¶ 22] *Lindeman* is distinguishable from the instant case. Although both cases involved outside evidence going before the jury during deliberations, the circumstances and contents of the evidence in *Lindeman* were far more prejudicial. Whereas the shipment box and bottles of alcohol in *Lindeman* could have logically been seen by the jury as direct evidence linking the defendant to the crime of "engaging in the liquor traffic," here, the jury only heard indiscernible background noise from a secondary recording of the surveillance video. There is no indication the audio was understandable, let alone prejudicial. Lindeman faced undue prejudice from the inadvertent inclusion of the box of alcohol that was improperly admitted during deliberations. Moreover, Lindeman objected to the admission of the box of alcohol. Here the video was entered into evidence by stipulation and without any limitation, and the record reflects the defendants were aware the video contained audio. After it was discovered the jury heard the audio, no objection was made. Considering the overriding differences in the two cases, *Lindeman* does not control our decision in this case. In light of our discussion of this matter in Part A, we conclude the court did not commit obvious error with respect to this issue.

### III

[¶ 23] The Ratliffs and Boulduc argue the court erred when it failed to instruct the jury pool to disregard a statement made by a prospective juror during voir dire. During voir dire, a juror from the venire stated he read about the story, and "from what I heard and, then, what

everybody—I guess what I've—what everybody was saying about it. It sounds like they did do it; so. . . ." The prospective juror was excused. The remaining jurors were questioned whether they had formed an opinion about the case. The jury pool members indicated they had not formed an opinion. No challenge was made to the panel for cause, and no request for an instruction was made by counsel.

[¶ 24] This issue was not raised in the defendants' motion for a new trial. "A defendant may move for a new trial under N.D.R.Crim.P. 33. A motion for a new trial must specify the alleged defects and errors with particularity. A defendant is required to assert all alleged errors in a motion for new trial." *State v. Middleton*, 2012 ND 181, ¶ 5, 820 N.W.2d 738 (citation omitted). This Court has stated, "although a motion for new trial is not necessary for appellate review, when a new trial is sought, the party making the motion is limited on appeal to the grounds presented to the trial court in the motion for a new trial." *State v. Zajac*, 2009 ND 119, ¶ 8, 767 N.W.2d 825.

[¶ 25] The defendants contend, however, the district court committed obvious error when it failed to instruct the jury appropriately or dismiss the entire jury panel following the statements made by the excused juror. This Court does not automatically apply obvious error analysis to appellate issues that were not raised in a motion for a new trial. *Middleton*, 2012 ND 181, ¶ 7, 820 N.W.2d 738. "[W]e will apply obvious error only 'to prevent an unjust conviction,' or the 'exceptional situations where the defendant has suffered serious injustice.'" *Id.* (citation omitted). These statements, given in the context of the entire trial, do not present an exceptional situation where the defendants have suffered a serious injustice, or an unjust conviction. The lone issue the defendants identified in their motion for a new trial concerned the surveillance audio. The defendants failed to preserve this issue for further review on appeal.

## IV

[¶ 26] Boulduc contends he was denied the right to represent himself at trial. During trial, Boulduc inquired whether he could recall a witness if he fired his attorney. The court denied his request. Boulduc did not argue he was denied the right to represent himself in his motion for a new trial. Thus, this issue was not properly preserved for appellate review.

[¶ 27] Nonetheless, Boulduc urges this Court to review whether the court committed obvious error. He contends the court's error is of a constitutional magnitude and caused serious injustice. As referenced above, we will apply obvious error only to prevent an unjust conviction, or in exceptional situations where a defendant has suffered serious injustice. *Middleton*, 2012 ND 181, ¶ 7, 820 N.W.2d 738; N.D.R.Crim.P. 52(b). Boulduc's request for self-representation was neither timely nor unequivocal. This case does not present an unjust conviction nor rise to the level of serious injustice. We conclude Boulduc failed to preserve this issue on appeal and we decline to further review the issue for obvious error.

## V

[¶ 28] The defendants argue the court erred in denying their joint N.D.R.Crim.P. 29 motion for judgment of acquittal because there was insufficient evidence to sustain a guilty verdict for each charge. At the close of the State's case, the defendants moved for judgment of acquittal of all the charges. The court denied the motion. After the defendants were found

guilty, they filed a motion for a judgment of acquittal on the two counts of aggravated assault, arguing there was insufficient evidence to sustain the convictions. The court denied the motion.

[¶ 29] The defendants did not raise the issue of insufficient evidence in their motion for a new trial. Generally, when a new trial is sought, the party making the motion for a new trial is limited on appeal to the grounds presented in the motion to the district court. *Middleton*, 2012 ND 181, ¶ 5, 820 N.W.2d 738. In this case, however, the defendants filed their post-verdict Rule 29 motion for judgment of acquittal simultaneously with their joint motion for a new trial. The district court held a joint hearing on both the motions but entered a separate order denying each motion. Because the defendants filed the motions simultaneously, and because the court held a hearing on the issues, we conclude the intent of the rule is satisfied and the defendants properly preserved the issue of sufficiency of the evidence on appeal. *See State v. Jordheim*, 508 N.W.2d 878, 881 (N.D.1993) (stating "the purpose of the rule . . . is to allow the lower court, in its decision on whether to grant a new trial, to review *all* alleged errors.") (emphasis in the original); 4 C.J.S. *Appeal and Error* § 317 (2007) (stating, "The purpose or object of a motion for a new trial is to call the attention of the trial court to its alleged erroneous rulings, and thus give the court an opportunity to correct its own errors . . . [and] preserve matters of exception for appellate review.").

[¶ 30] In reviewing the sufficiency of the evidence, this Court will review the record to determine if there is competent evidence allowing the jury to draw an inference reasonably tending to prove guilt and fairly warranting a conviction. *State v. Romero*, 2013 ND 77, ¶ 24, 830 N.W.2d 586. The burden is on the defendant to show the evidence reveals no reasonable inference of guilt when viewed in the light most favorable to the verdict. *Id.* We will not reweigh conflicting evidence or judge the credibility of witnesses. *Id.* "A [trier of fact] may find a defendant guilty even though evidence exists which, if believed, could lead to a verdict of not guilty." *Id.* "A verdict based on circumstantial evidence carries the same presumption of correctness as other verdicts, and will not be disturbed on appeal unless it is unwarranted." *State v. Steinbach*, 1998 ND 18, ¶ 16, 575 N.W.2d 193. "A conviction may be justified on circumstantial evidence alone if the circumstantial evidence has such probative force as to enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *State v. Noorlun*, 2005 ND 189, ¶ 20, 705 N.W.2d 819.

[¶ 31] The defendants argue there is insufficient evidence to find them guilty of two counts of aggravated assault. They contend Carmen and Sherman Jones each testified they were assaulted by only one of the intruders. Carmen's testimony suggests she was beaten by one of the men and heard the other two men hitting her husband. Sherman testified he was struck by one of the individuals holding him down, his face was forced to the carpet and he lost consciousness.

[¶ 32] This Court has previously affirmed convictions based on sufficiency of the evidence, although the victim does not recall who inflicted the assault. *See State v. Schweitzer*, 2007 ND 122, ¶ 21, 735 N.W.2d 873; *State v. Schimetz*, 328 N.W.2d 808, 812 (N.D.1982) ("Although we recognize that no evidence was introduced that anyone saw the actual stabbing, we believe there was sufficient circumstantial evidence presented to warrant a finding of guilt by the jury.").

[¶ 33] Here, notwithstanding the Jones's testimony indicating they were each assaulted by only one assailant, looking at the record, there is competent evidence from which the jury could draw an inference reasonably tending to prove guilt as to both charges for all three defendants. The jury heard testimony from the Joneses that three masked men forcibly entered their home armed with tire thumpers. The Joneses were manhandled, manacled in duct tape and repeatedly battered with kicks and bats. Carmen testified that prior to the attack, she was disabled, had numerous surgeries, including brain surgery, and had problems with her short-term memory, depth perception, and her peripheral vision. She testified that during the attack, her hands were tied behind her back, she was forced on her knees and her head was put into a chair. A jury could have inferred she was not able to view the full extent of the assaults given her positioning and her medical and vision problems and that in the chaos of the robbery she was assaulted by all three defendants. Similarly, a jury could have inferred Sherman was attacked by all three assailants when his face was in the carpet or after he lost consciousness. The men were dressed in a similar fashion and it could be difficult to discern who was who. Evidence was also admitted showing the victims' multiple injuries, which the jury could have reasonably inferred were inflicted by more than one assailant. Viewing the evidence in the light most favorable to the verdict, we conclude the jury could have found the defendants guilty of both counts of aggravated assault beyond a reasonable doubt.

[¶ 34] The defendants also contend there was insufficient evidence to sustain the other charges. Viewing the evidence in the light most favorable to the verdict, there was sufficient circumstantial evidence from which the jury could have found the defendants guilty on all counts. The jury heard evidence the defendants were using a stolen red Tiburon. Hours before the robbery, the defendants were overheard discussing a robbery and left together soon after. The jury heard testimony that an eyewitness observed three men matching the defendants' descriptions loading televisions into a red car near the crime scene. After the robbery took place the defendants were seen with the Jones's stolen property, masks and gloves. Evidence was also presented the defendants pawned the Jones's property. The jury also heard testimony the defendants were arrested with masks, gloves, and the Jones's stolen property in their possession. We conclude there was sufficient evidence to establish the defendants were each guilty with respect to each charge.

## VI

[¶ 35] We affirm the criminal judgments and the orders denying the defendants' motion for a new trial and Rule 29 motion for judgment of acquittal.

[¶ 36] DALE V. SANDSTROM, LISA FAIR McEVERS, CAROL RONNING KAPSNER, DANIEL J. CROTHERS, JJ., concur.

CROTHERS, Justice, specially concurring.

[¶ 37] I write separately not out of disagreement with the Court's decision but out of uncertainty, and hence concern, about where this holding will take us when electronically stored information becomes a greater source of evidence.

[¶ 38] We intuitively know that a great deal of information generated today is created by electronic means. People routinely communicate by electronic device, using electronic mail, text messages and social media. These electronic communications

increasingly are used instead of handwritten correspondence, telephone calls and person-to-person conversation. Commercial and business transactions often occur by or with the assistance of electronic information exchanges. Evidence of these electronic events is both discoverable and admissible. *See* N.D.R.Civ.P. 34(a)(1)(A) (A party may request production of "any designated documents or electronically stored information—including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations—stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form[.]"); N.D.R.Civ.P. 26(b)(1)(A) ("[T]he phrase 'electronically stored information' includes reasonably accessible metadata that will enable the discovering party to have the ability to access such information as the date sent, date received, author, and recipients."); *State v. Thompson*, 2010 ND 10, ¶ 26, 777 N.W.2d 617 (The district court did not err admitting evidence of text message after proponent offered sufficient authentication under N.D.R.Ev. 901.).

[¶ 39] One noted treatise on evidence explained the prevalence of electronic information:

"Individuals increasingly rely on computers in their daily lives for personal and business purposes. In business, correspondence by computer is rapidly becoming the preferred means of communication. Indeed, a substantial and growing amount of business data in the United States is now created and transmitted solely in electronic form.

"The Internet, which connects computers and their databases around the world, harnesses and magnifies the power of individual computers. Information located anywhere on the world-wide Internet computer network can be instantaneously accessed, retrieved, and downloaded from any computer, anywhere in the world. Equally important, the Internet serves as a vehicle to transmit electronic messages (e-mails).

"All this computer-based information is stored in various electronic and magnetic media, which provide vast resources that can be mined in discovery or seized from a party and admitted as evidence at trial. Bulky computers initially stored this data, but they have been replaced with sleek mobile units that are significantly more powerful. This trend in computer downsizing is driven by constant advances in miniaturization. Small devices, like 'thumb drives,' now store enormous amounts of data."

5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 900.01[1] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.1997) (footnotes omitted).

[¶ 40] Many electronic documents generated by cyber-interaction will contain hidden content called metadata. *Weinstein's* treatise explains the nature of metadata as follows:

"Metadata, other than file names, are not shown when documents are viewed on a monitor screen, but can be easily retrieved. Metadata can reveal the evolution of a document. Earlier drafts of a document, the dates of subsequent revisions, and the identity of persons revising a document are routinely captured by software applications. Metadata may also identify anyone downloading, printing, or copying a specific document. Different software applications may generate different types of metadata. In many cases, metadata may bear little relevance or usefulness. However, metadata can include infor-

mation in some applications that is essential to a full understanding of the product generated by the software application, *e.g.,* the formulas in a spreadsheet."

5 *id.* § 900.01[4][a] (footnote omitted). *See also Country Vintner of North Carolina, LLC v. E. & J. Gallo Winery, Inc.,* 718 F.3d 249, 252–53 n. 4 (4th Cir.2013) (" 'Metadata may reveal who worked on a document, the name of the organization that created or worked on it, information about prior versions of the document, recent revisions, and comments inserted in the document during drafting or editing.... The hidden text may reflect editorial comments, strategy considerations, legal issues raised by the client or the lawyer, or legal advice provided by the lawyer.' Metadata may provide information that a paper document would not provide or information that differs from a paper document. Metadata may also reveal that a document has been changed or backdated." (citation omitted)).

[¶ 41] Given our holding in the present case, lawyers and judges increasingly must be vigilant about identifying and knowing precisely what "evidence" is being admitted. Here, we hold that admission of the DVD included video and audio. Majority opinion at ¶¶ 18, 22. When another form of electronic information is introduced—say an electronic document—questions may arise whether they contain metadata. If so, is metadata being admitted along with the information on the face of the document? Knowing the answer will be important to lawyers, who must "provide competent representation to a client." N.D.R. Prof. Conduct 1.1. A comment to the American Bar Association Model Rule of Professional Conduct 1.1 has been modified to provide, "To maintain the requisite knowledge and skill, a lawyer should keep abreast of changes in the law and its practice, *including the benefits and risks asso-*

*ciated with relevant technology,* engage in continuing study and education and comply with all continuing legal education requirements to which the lawyer is subject." Model Rules of Prof'l Conduct R. 1.1 cmt. 8 (emphasis added). The rules of professional conduct also impose obligations that lawyers maintain client confidences and that inadvertent transmission of documents be handled a certain way. *See* N.D.R. Prof. Conduct 1.6 and 4.5(a). Comment 1 to Rule 4.5 notes, "For purposes of this rule, 'document' includes e-mail or other electronic modes of transportation subject to being read or put into readable form." In another context, the importance of a lawyer's understanding of the extent of evidence available in electronic documents arose in a postconviction relief proceeding. There, the defendant claimed the prosecutor should have offered into evidence the electronic versions of social media posts and emails rather than printouts so the court could have reviewed the metadata. *People v. Anderson,* No. 311448, 2014 WL 1383399, at *3–4 (Mich. App. April 8, 2014).

[¶ 42] Judges also will increasingly be called on to know and understand the depth of evidence used in judicial proceedings. Civil discovery rules 16 (pretrial conference), 26 (scope of discovery), 33 (interrogatories), 34 (requests for production), 37 (sanctions) and 45 (subpoenas) specifically address electronic information. The present case demonstrates the importance of monitoring electronic evidence in jury trials, where a verdict could be reversed if non-admitted evidence reaches the jury room. Majority opinion at ¶¶ 12–22; *State v. Lindeman,* 64 N.D. 518, 254 N.W. 276, 280 (1934). Knowing and understanding the quantum of evidence before the court also will be important to judges considering dispositive motions supported by electronic documents or who

are presiding over a bench trial where proof is offered through electronically stored information. Judges are prohibited from conducting independent investigations. N.D. Code Jud. Conduct Rule 2.9(C) ("Except as otherwise provided by law, a judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed."). Comment 6 to Rule 2.9 emphasizes, "The prohibition against a judge investigating the facts in a matter extends to information available in all mediums, including electronic." Therefore, when the court is presented with electronically created or stored information, the judge must know whether the submitted evidence includes only that information visible on the surface of the document, or whether metadata is included. The distinction is critical, both on an ethical and adjudicative basis.

[¶ 43] Our decision today properly answers the narrow question presented in the context of the facts of this case. At the same time, the decision exposes a great number of potential questions, and I sample just a few of them to alert the bench and bar of concern as the nature of adjudicative evidence shifts from one-dimensional paper to multi-dimensional electronic documents.

[¶ 44] DANIEL J. CROTHERS